658 S.W.2d 448 (1983)
STATE of Missouri, ex rel. GULF TRANSPORT COMPANY, Relator-Appellant,
v.
PUBLIC SERVICE COMMISSION OF the STATE of Missouri, Respondent, and
Mid-American Coaches, Inc., Greyhound Lines, Inc., Continental Trailways, Inc., Midwest Buslines, Inc., American Buslines, Inc., V-K Bus Lines, Inc., and Vandalia Bus Lines, Inc., Intervenors-Respondents.
No. WD 32885.
Missouri Court of Appeals, Western District.
March 29, 1983.
Motion for Rehearing and/or Transfer Denied May 31, 1983.
Application for Transfer Sustained June 30, 1983.
Case Retransferred October 11, 1983.
Opinion Readopted October 14, 1983.
*450 William H. Curtis and Gene S. Martin, Jr. of Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, and John H. Doeringer, Chicago, Ill., for relator-appellant.
Kent M. Ragsdale and Thomas R. Parker, Jefferson City, for respondent Public Service Com'n of Missouri.
W.R. England, III, Jefferson City, for intervenor-respondent Mid-American Coaches, Inc.
Elvin S. Douglas, Jr. of Crouch, Crouch, Spangler & Douglas, Harrisonville, for intervenors-respondents, Greyhound Lines, Inc., Continental Trailways, Inc., Midwest Buslines, Inc. and American Buslines, Inc.
Donald K. Anderson, Jr. of Latourette & Weyerich, St. Louis, for intervenors-respondents V-K Bus Lines, Inc. and Vandalia Bus Lines, Inc.
Before SOMERVILLE, C.J., and SHANGLER, PRITCHARD, WASSERSTROM, MANFORD, KENNEDY and LOWENSTEIN, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1983.
Court of Appeals Opinion Readopted October 14, 1983.
MANFORD, Judge.
This appeal is taken from a circuit court judgment affirming the report and order of the Missouri Public Service Commission which denied relator's application for a certificate of public convenience and necessity. Jurisdiction for purposes of this appeal is vested in this court by § 386.540, RSMo 1978. The judgment is reversed with directions.
Three points are presented which in summary charge the circuit court erred in affirming the report and order of the Commission because (1) the "policy" authorizing charter rights only in conjunction with regular route operations as expressed and applied by the Commission in its order denying appellant's application is unreasonable and unlawful because there are no facts in the record justifying the application of such a "policy" and such a "policy" is contrary to § 390.051, RSMo 1978 and this court's interpretation of § 390.051, RSMo 1978; (2) the Public Service Commission's refusal to grant appellant's application for irregular route authority was unreasonable as a matter of law because the Commission's conclusion that no need was demonstrated is not supported in the record and the Commission, in considering need, refused to give weight to the quality of appellant's service being offered and the preference of charter bus customers; and (3) the findings of fact and conclusions of law of the Commission were unreasonable and unlawful as a matter of law because (a) the record does not show any substantial impact upon protestants' charter business in St. Louis, St. Charles and Jefferson counties which would occur from competition there with appellant; (b) the record does not support any need for protestants' regular routes throughout Missouri to be subsidized by their charter revenues and profits, if any, from St. Louis, St. Charles and Jefferson counties; (c) there is no factual or legal justification for requiring charter bus customers in St. Louis, St. Charles and Jefferson counties to subsidize the regular routes of protestants.
For purposes of this opinion, the parties are identified as follows: Gulf Transport Co. is the relator-appellant and is hereinafter referred to as relator. The Missouri Public Service Commission is co-respondent *451 and is hereinafter referred to as the P.S.C. There were seven intervenors: Greyhound Lines, Continental Trailways, Midwest Buslines, American Buslines, (Midwest and American are subsidiaries of Continental), V-K Bus Lines, Vandalia Bus Lines and Mid-American Coaches. Intervenors protested the application and are hereinafter referred to as protestants. Protestants entered this cause pursuant to § 390.051, RSMo 1978.
The record reveals the following pertinent facts. On February 20, 1980, relator filed an application for a certificate of public convenience and necessity seeking irregular route authority for the transportation of passengers from points of origin in St. Louis, St. Charles, and Jefferson counties in Missouri to all points in the state.
A hearing on relator's application was held on April 1 and 2, 1980 by a hearing examiner for the P.S.C. to determine the propriety of irregular route market entry by relator. The P.S.C. rendered its report and order on August 20, 1980 denying relator's application. On September 23, 1980, relator's application for rehearing was overruled by the P.S.C. Upon relator's petition, a writ of review was issued by the circuit court on October 14, 1980. The circuit court affirmed the P.S.C. order on May 20, 1981. This appeal followed.
Relator is a Mississippi corporation which operates as a regular route common carrier of passengers by motor vehicle in the states of Alabama, Mississippi, Tennessee, Kentucky, Illinois, Indiana, and within an extremely limited area of Missouri. Relator commenced business in 1936. Relator's only regular route authority in Missouri consists of a one mile stretch from the bus terminal in St. Louis to the Mississippi River Bridge. Relator possesses interstate operating authority from the Interstate Commerce Commission (I.C.C.) and has charter bus rights ancillary to the interstate authority. This I.C.C. authority permits relator to operate charter bus operations from St. Louis throughout the continental United States and all provinces of Canada. This I.C.C. authority also allows relator to provide charter service from St. Louis and its commercial zone[1] to points in Missouri where the interstate nature of the movements has been established by inclusion of tour points outside of Missouri. As a result, relator must, for example, take charters from St. Louis, Missouri to Kansas City, Kansas for overnight lodging to preserve the interstate character of the charter even though activities on the Missouri side were the principal focus of the trip. Relator provides this service, in part, by maintaining personnel, an office and a garage facility in St. Louis to conduct its business. Relator's application was filed as a request for intrastate operating authority because it has received numerous requests for intrastate charter tours as a result of its substantial interstate charter business. Relator seeks operating authority in order to accommodate this demand. Other facts pertaining to the issues herein will be developed and discussed as applicable within the remainder of this opinion.
The principal statutory provisions applicable herein are subsections 5. and 6. of § 390.051, RSMo 1978, which read as follows:
"5. If the Commission shall find from the evidence that public convenience and necessity will be promoted or that there is public need for the creation of the service proposed, or any part thereof, and that the applicant is qualified properly to perform the service proposed and to conform to the provisions of Section 390.111 to 390.176 and the requirements rules and regulations of the Commission established thereunder, a certificate therefor shall be issued."
6. In determining whether a certificate should be issued, the Commission shall give reasonable consideration to the transportation service being furnished by any common carrier by rail or motor vehicle *452 and the effect which the proposed transportation service may have upon such carriers; provided, that the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the Commission the public convenience and necessity will be promoted by so doing."
Review of the report and order of the P.S.C. is limited to the determination of whether the report and order are lawful and reasonable. State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission, 585 S.W.2d 41 (Mo. banc 1979); Empire Dist. Elec. Co. v. Cox, 588 S.W.2d 263 (Mo.App.1979). The lawfulness of an order of the P.S.C. depends on whether there exists statutory authority for its issuance. State ex rel. City of Cape Girardeau v. Public Service Commission, 567 S.W.2d 450 (Mo.App.1978). Decisions of administrative agencies based upon their interpretation of the law is a matter of independent judgment for a reviewing court and will be corrected where erroneous. Daily Record Co. v. James, 629 S.W.2d 348 (Mo. banc 1982).
The reasonableness of a report and order of the P.S.C. depends on whether the report and order are supported by competent and substantial evidence upon the whole record. State ex rel. Beaufort Transfer Co. v. Public Service Commission of Missouri, 610 S.W.2d 96 (Mo.App.1980). Findings by the P.S.C. are considered prima facie correct and a party challenging them bears the burden of showing such findings are not reasonable or lawful. State ex rel. Inman Freight System, Inc. v. Public Service Commission, 600 S.W.2d 650 (Mo.App. 1980). Upon review, this court is prohibited from substituting its judgment for that of the P.S.C., but it is entitled to determine whether the P.S.C. could have reasonably made its findings and reached the results announced in its findings and order by consideration of all the evidence presented. State ex rel. Oliver v. Public Service Commission, 542 S.W.2d 595 (Mo.App.1976).
The points presented by relator can be reduced to three simply worded questions which are stated prior to the full consideration of the applicable facts and circumstances specific to this case: (1) Was the P.S.C.'s cross-subsidization policy supported by statutory authority? (2) Was a public need demonstrated for requested charter bus service? and (3) Would the competitive effect of new entry of other charter and regular route service justify denial of relator's application?
The first of the above questions require a determination of whether the factors utilized by the P.S.C., in denying relator's application, are supported by statutory authority. The P.S.C. is an administrative agency with limited jurisdiction and the lawfulness of its actions depends directly on whether it has statutory power and authority to act. State ex rel. Phillip Transfer Lines, Inc. v. Public Service Commission, 599 S.W.2d 82 (Mo.App.1980); State ex rel. Beaufort Transfer Co. v. Clark, 504 S.W.2d 216 (Mo.App.1973). Where such authority is lacking, a reviewing court may reverse. Thus, in State ex rel. Phillip T. L. Inc. v. Public Service Commission, 523 S.W.2d 353 (Mo.App.1975), this court found that the P.S.C. lacked authority to determine the reasonableness of jointly established through routes pursuant to § 390.116, RSMo 1969.[2]
The reading of the findings of fact and conclusions of law entered by the P.S.C. in the instant case reveals that the "policy" of not granting irregular route authority where an applicant holds no regular route authority was a decisive factor in the denial of relator's application. This "policy" was expressed by the P.S.C. as follows:
"The policy of this Commission, in implementing motor carrier regulation, is to preserve, to the maximum extent possible, the complete transportation system for the entire state, not for a particular area. In furtherance of that goal, the *453 Commission has consistently linked charter operations to regular route authorities. This practice is pursued, even to the extent of cancellation of charter rights from points where regular route carriers terminate operations. This policy is in recognition of the frequent losses resulting from regular route operations which must be subsidized by the more profitable charter carriage. In the Commission's opinion, it would be an abuse of its discretion to permit the applicant to subsidize its unprofitable regular route operations in other states by engaging in charter operations in the State of Missouri.
The Commission, in pursuit of its goal, has historically refrained from granting only charter authorities to intercity carriers. To do so now, and create additional competition for charter revenues being enjoyed by the carriers performing regular route service would necessitate a liberization [sic] of attitude in applications to abandon unprofitable routes. This we are unwilling to do and reiterate our policy of generally authorizing charter rights in conjunction with regular route operations in absence of a clear showing that regular route carriers cannot perform all requested charter service." (emphasis added)
The result of the foregoing declaration of "policy" by the P.S.C. is that entry into intrastate irregular route markets is contingent upon the provision of intrastate regular route service by an applicant before operating authority will be granted. The P.S.C. suggests that the authority for such "policy" arises from § 390.041.1, RSMo 1978 which vests in the P.S.C. the power and authority "to establish reasonable requirements with respect to adequate and continuous service ..." The P.S.C. further suggests that our statutes evince a generalized "preference" for regular route carriers over irregular route carriers and cite in support of this position § 390.051.8, RSMo 1978 as well as prior P.S.C. decisions.
Where an agency of the state such as the P.S.C. is charged with enforcement of a statute, the construction given that statute by the agency is entitled to some weight regarding its interpretation. State ex rel. Hering v. State Public Service Commission, 549 S.W.2d 658 (Mo.App.1977). But where an administrative decision is clearly based upon an agency's interpretation or application of the law, the agency's conclusion of law and any decision based thereon become a matter for the independent judgment of the reviewing court and are subject to correction where erroneous. Daily Record Company, supra; M.V. Marine Co. v. State Tax Commission of Mo., 606 S.W.2d 644 (Mo. banc 1980); St. Louis County v. State Tax Commission, 562 S.W.2d 334 (Mo. banc 1978). The exercise of such independent judicial judgment, in spite of argument to the contrary by the P.S.C., is not constrained by pronouncements of administrative agencies. Where, as in the instant proceedings, the P.S.C. "recognizes a preference for the motor carrier service provided by a regular route carrier", such pronouncement is of no importance if upon analysis of the statutory law of this state, a reviewing court reaches a different conclusion. The P.S.C. urges this court to extrapolate from the language of § 390.051.8 a preference for regular route service. Section 390.051.8 reads:
"It shall be unlawful for any common carrier, except one having a certificate authorizing such service to accept persons or property for transportation between points on the route of a regular route common carrier or between points on the routes of two or more regular route common carriers where through or joint service has been authorized or established between such regular route common carriers."
Relator herein is not seeking by its application to operate between points already served by regular route carriers. The foregoing section has been considered by this court in State ex rel. Phillip v. Public Service Commission, 599 S.W.2d 82, supra at 88, where we declared:
"The import of § 390.051(8) is to exclude irregular route carriers from the transport of goods between points served *454 by regular route carriers, thus granting to the regular carriers so certified the exclusive entitlement to that segment of the freight business."
This court concludes that neither the language of § 390.051.8 nor the rule in State ex rel. Phillip, either directly or by implication, authorize the P.S.C. to recognize "a preference for a regular route carrier" and by such recognition, establish a policy that an applicant for an irregular route operating certificate must furnish regular route authority as a condition precedent.
In the closest reported decision on point, State ex rel. Pitcairn v. Public Service Commission, 232 Mo.App. 755, 111 S.W.2d 982 (1937), nothing is mentioned, nor any rule established that intrastate regular route service is a condition precedent to procurement of irregular route charter bus authority.[3]Pitcairn arose from an attempt by a rail carrier to prevent irregular route market entry by a charter bus service. This court declared that far from being subservient to regular route service, irregular route carriage was a vital component of Missouri's transportation system:
"Literal compliance with the provisions of the statutes in so far as applications for certificates covering irregular routes are concerned, is impossible. If, then, it is held that there must be such compliance, we will have held, in effect, that no certificate authorizing service over an irregular route may be legally issued. Such a decision would outlaw every common carrier of persons, and probably also of property, by motor vehicle, in the state of Missouri excepting those operating over regular routes. Such a construction would defeat the very purpose the Legislature intended to accomplish when the law was enacted. That purpose, as declared by the Supreme Court in State ex rel. v. Atkinson, 275 Mo. 325, loc. cit. 337, 204 S.W. 897, and in State ex rel. v. Public Service Commission, 324 Mo. 270, loc. cit. 276, 23 S.W.2d 115, was to regulate all motor vehicle common carriers for the good of the public. Appellants urge that we make of this benevolent act a sinister and deadly weapon with which and by which one important branch of this vital industry of transportation shall be outlawed and legally abolished; and this in view of the additional fact that, until 1931, this particular branch of transportation was the favorite of the law and was specifically exempted from all regulation." (emphasis added) Pitcairn, 111 S.W.2d at 986.
If the instant "policy" of the P.S.C. is permitted to stand, the effect would be to bar the entry of new competitors into intrastate charter bus markets in our state. This would foreclose automatically new entrants who might provide superior service at lower costs to consumers. We have previously made it clear that our statutes announce and provide a policy of regulated competition for the public benefit and not a policy of sanctioned monopoly. Beaufort Transfer v. Clark, supra. To the extent the P.S.C. is authorized to restrain competition, it must do so consistent with the public interest and concern itself with existing utilities "only in an incidental manner." State ex rel. Public Water v. Public Service, 600 S.W.2d 147, 155 (Mo.App.1980). This same rationale applies to the Missouri Bus and Truck Law.
While not argued specifically by relator on this appeal, we also note that the Commission's regular route policy "preference" has not been published pursuant to the Missouri Administrative Procedure Act, § 536.021, RSMo 1978. In State ex rel. Beaufort v. Public Service Comm., 610 S.W.2d, supra, at 99-100, this court held that an attempt by the P.S.C. to apply generally an irregular route base definition was "a rule within the definition of § 536.010, RSMo 1978" and that an order using such definition was invalid because the rule-making procedure had not been observed. In the instant case, whether the P.S.C. had complied with the Missouri Administrative Procedure Act *455 would not, of course, resuscitate the Commission's "policy" where no statutory authority provides for the discretionary exercise of such a "preference". Johnson v. Labor and Ind. Relations Comm., 591 S.W.2d 241 (Mo.App.1979). The failure of the Commission to publish and articulate coherent standards for the application of its "policy" does, however, underscore the illegitimacy of any general "preference" in favor of regular route carriers.
In defense of its policy, the respondents cite to this court State ex rel. Nat. Trail Con., Inc. v. Public Service Comm., 488 S.W.2d 942, 944 (Mo.App.1972). The respondents direct this court to the following language within that case:
"The purpose of our Public Service Commission laws is basically to secure uniformity of operating conditions among similar carriers; to secure adequate and sustained service for the public at the least possible cost; to prevent economic waste that follows useless duplication of service; and to protect and conserve investments already made to furnish and maintain such public service."
From the foregoing, the respondents argue that a duty is imposed upon the P.S.C. to preserve a transportation system for the entire state. While we do not dispute this general goal, such language does not address the issue herein, which is whether the cross-subsidy policy of the P.S.C. is a permissible means of realizing its statutory obligations. If the position of the respondents was upheld and this court was to approve a policy of protectionism as necessary to guarantee adequate regular route revenues, we would be ignoring the comprehensive rate-making authority of the Commission under § 390.041, RSMo 1978. Even if we were to assume that present regular route tariffs are insufficient, the Commission can review such tariffs and act accordingly. This is a much more precise and far less intrusive approach than that of barring entry of other irregular route operators on the premise that regular route authority is a prerequisite to the grant of a charter bus operating certificate.
This court concludes that there is no statutory basis permitting the P.S.C. to deny relator the authority to operate an irregular route on the ground that relator holds no preexisting regular route authority. The order of the P.S.C. was based on a "policy" that lacks statutory support and is contrary to a system of "regulated competition." Such "policy" is found to have no application to the instant proceedings, nor to relator herein, and is held inapplicable and void. Absent legislative change, said "policy" and any conclusions or orders based thereon regarding pending or future applications shall also be void and of no lawful force or effect. Question number (1) above is answered in the negative and in conjunction with that answer it is found that relator's point (1) has merit and is sustained in favor of relator.
In the instant case, we are faced with two additional arguments advanced by respondents as independent grounds for the denial of irregular route authority to Gulf: (a) Gulf failed to prove a "public need" for the service, and (b) denial was justified based on the effect of new entry on incumbent carriers. These arguments pose important issues for resolution in the context of our construction of § 390.051, RSMo 1978.
Under point (2) of its argument on appeal, relator contends that the refusal of the P.S.C. to grant irregular route authority based on Gulf's failure to show a public need is not supported by the record. Error is also charged in the refusal of the P.S.C. to give weight to the quality of relator's service and to the preferences of charter bus customers. In conjunction with relator's point (2), this court perceives the basic question to be: Was a public need demonstrated for requested charter bus service? Although the Commission interrelates this issue with its "policy" discussed above, it offers the alternative argument that relator failed to demonstrate a public need for additional charter bus service. In drawing this conclusion, the P.S.C. interpreted "public convenience" to require a showing that "there is a failure, breakdown, incompleteness *456 or inadequacy in the existing facilities" and on the finding there was "virtually no incident where any person has been unable to secure charter service" from incumbent carriers.
Prior to consideration of the specific facts and circumstances of the instant proceedings, it is necessary to discuss briefly some basic applicable principles. In the analysis above, this court observed that the statutory law regarding the motor carrier industry establishes a scheme of regulated competition and not officially sanctioned monopoly. State ex rel. Beaufort Transfer, supra. When the entire statutory framework creating and authorizing the P.S.C. is examined, it becomes apparent there exists a fundamental difference between the economic structure of the motor carrier industry and that of traditional public utilities such as electrical power, communications, water, and natural gas. The industries in this latter group have generally been classified as theoretical "natural monopolies".[4] Unlike these so-called "natural monopolies", the motor carrier industry is characterized by comparatively low fixed cost and capital investment requirements which serve as high entry barriers to new competition in natural monopoly industries. The absence of these barriers to entry in the motor carrier industry reduces significantly the possibility of monopoly pricing because attempts to engage in such pricing attract new competition. Competition benefits the carrier-using public, because it forces prices closer to cost, and creates incentives to provide the service desired by consumers.[5] The decisional law of our state and other jurisdictions makes competition an integral part of evaluating the need for additional service in the motor carrier context. The overriding consideration has been and remains the convenience and necessity of the public and not any individual or group of individuals. State ex rel. Missouri, Kansas, and Oklahoma Coach Lines v. Public Service Commission, 238 Mo.App. 317, 179 S.W.2d 132, 136 (1944). Although an applicant bears the burden of proof in such matters, State ex rel. Oliver v. Public Service Commission, supra, the rights of individuals, including protesting carriers, are subservient to the rights of the public. State ex rel. Interstate Transit Lines v. Public Service Commission, 234 Mo.App. 554, 132 S.W.2d 1082, 1087 (1939). Even if the grant of a certificate produces some adverse impact on incumbent carriers, such loss to protestants can be outweighed by the gain to the public in better service. State ex rel. Churchill Trk. Lines v. Pub. Ser. Comm., 555 S.W.2d 328, 335 (Mo.App. 1977). In our most recent statement of this principle, we observed: "The effect upon other common carriers is to be considered by the Commission, but an adverse effect upon them yields to a public need for the service". State ex rel. Twehous Excavating Company, Inc. v. Pub. Service Com'n., 617 S.W.2d 104, 106 (Mo.App.1981).
Section 390.051, RSMo 1978 does not create protectionism for the benefit of incumbent carriers, but rather, has been enacted for the purpose of promoting and conserving the interest and convenience of the public. Thus, in State ex rel. Public Water we observed that the P.S.C. must have as its principal goal, the vindication of the public interest and must concern itself with competing utilities only incidentally.
The need to consider the potential benefits accruing to the public from additional competition has been recognized by recent decisions interpreting the Federal Motor Carrier Act of 1935, 49 U.S.C. § 10922(a). See Sharron Motor Lines, Inc. v. United States, 633 F.2d 1115 (5th Cir.1981); Watkins Motor Lines, Inc. v. I.C.C., 641 F.2d 1183 (5th Cir.1981); P.A.K. Transport, Inc. v. United States, 613 F.2d 351 (1st Cir. 1980); and Sawyer Transport, Inc. v. United States, 565 F.2d 474 (7th Cir.1977). The *457 need to consider such benefits has not been limited to federal decisional interpretation. See e.g., Gray Line Tours of Southern Nevada v. P.S.C., 626 P.2d 263 (Nev.1981); New England Household Moving and Storage, Inc. v. Public Utilities Commission, 117 N.H. 1038, 381 A.2d 745 (N.H.1977); and Morey v. Pub. Util. Commission, 196 Colo. 153, 582 P.2d 685 (Colo. banc 1978). From an analysis of the foregoing authority, two basic principles can be extracted and applied to the instant proceedings.
First, if the P.S.C. is to comply with the statutory requirement of § 390.011 that it regulate motor carriers for the interest and convenience of the public, then decisions by the P.S.C. must not be impervious to the potential benefits of additional competition. This is not to say that the P.S.C. may not conclude, if supported by substantial and competent evidence on the whole record, that other public interest considerations outweigh the salutary effects of competition in a given case. But where, as in the instant case, the statutory scheme contemplates a regime of regulated competition and emphasizes the public need over the effect of market entry on current carriers, Twehous, supra, it is an abuse of discretion for the Commission to ignore the potential benefits yielded by competition. Thus, we hold that the failure to consider the potential desirability of competition is enough to compel reversal of a P.S.C. decision under § 390.051, RSMo 1978. See also Niedert Motor Service, Inc. v. United States, 583 F.2d 954, 963 (7th Cir.1978).
A second principle derived from the foregoing authority is that an operating certificate may not be denied "simply because existing service is not clearly superior". Sharron, supra. See also Morey v. Pub. Util. Commission, supra. Although this court was speaking in the context of a case involving a utility which was arguably a natural monopoly, we specifically rejected an approach which made adequacy of existing facilities determinative of market entry in Public Water, supra. Instead, we adopted a balancing process which gives weight to the desirability of competition. Such an approach is particularly applicable in the motor carrier context, which does not exhibit "natural monopoly" characteristics.
Applying these principles, we now consider the evidence, findings and conclusions in the instant case. At the outset, the P.S.C. concedes that relator is an experienced, competent charter carrier qualified to perform the proposed service and that relator would have "little difficulty assuming operations under any authority to be granted by this application". The evidence relative to relator's equipment revealed that it possessed 61 modern 47-passenger, air-conditioned, restroom equipped highway type buses. The evidence also revealed that in anticipation of a general increase in business, it was Gulf's policy to purchase six new buses each year. The record also disclosed that during the summer months (when travel is heaviest) more than onehalf of relator's fleet is based in St. Louis. During the winter months, part of the fleet is sent south. The record also contained uncontested evidence that general market demand for charter bus service had expanded significantly in recent years and further growth was likely in the future.
The respondents argue that an applicant must demonstrate a present need for additional service and suggest that consideration of future conditions and increases in market demand are not legitimate components of the determination of public need. In support of this position, respondents refer this court to State ex rel. Oliver, supra at 598. An examination of Oliver discloses that the court's remarks concerning present need occurred in the context of its observation that the applicant's burden of proof could not be met by mere "speculation, guesswork, hopes or aspirations". Oliver does not prohibit consideration of the future as part of a comprehensive evaluation of whether the public convenience and necessity would be served by new entry. As this court recognized long ago, the future must be considered in determining whether the public convenience and necessity would be served by new entry. Ringo v. *458 Public Service Commission, 234 Mo.App. 549, 132 S.W.2d 1080, 1082 (1939).
The record also contains evidence concerning the quality and availability of service and pricing in intrastate charter bus markets. The evidence revealed that relator's proposed service was a package of services which included the arrangement of restaurant choices, information describing sight-seeing locations, hotel accommodations, menus, and prices. The importance and desirability of relator's proposed service was supported by several "consumer" witnesses who testified at the hearing. It would serve no purpose to specifically outline this lengthy testimony in light of an admission in the hearing examiner's report that declared "generally speaking, all of the individuals supporting the application seek the services of Gulf because of the additional information that can be obtained by the attractions in route and the prices charged." The record fails to reveal that any of the protestants furnished comparable service.
It is argued to this court that the showing of public benefits resulting from relator's proposed service is something "akin to" special operations unrelated to charter bus service. The Commission also makes the bare assertion in its report that like services could be provided by travel agents at no additional cost. This argument is not supported by the evidence in the record. The only reference by a witness to the possibility that like services could be provided by travel agents occurred during the cross-examination of Miller Johnson, a travel witness who testified in favor of relator's application. The record reveals the following exchange during cross-examination by counsel for one of the protestants:
"Q. And you are selling a group, then, that's performed so far as your use is concerned and then you arrange their transportation and their other facilities that they may want?
A. Yes, sir.
Q. And you are providing the type of service that the last witness indicated she was interested in in arranging the visits, the meals, and the rest stops, and things of that nature?
A. Yes, they either
Q. That's the type of service you're providing; is that correct?
A. Yes."
This meager testimony was not accompanied by any other evidence in the record that tour group representatives were aware of travel agencies' services, that such services were of the same quality as offered by Gulf, or that they were readily available with respect to all of the protesting carriers. In addition, Mrs. John Kemmy, representing a Catholic church group, stated under direct examination:
"Q. Have you investigated the possibility of contacting independent travel agents?
A. My experience, and I get many, many brochures from different travel agencies, I can figure within about a $4 or $5 cheaper trip when II mean per person which is pretty important when you're working with senior citizens on fixed incomes.
Q. I understand. When you figure it, though, that's a savings that you could make because you're not utilizing the services of the travel agency; is that correct?
A. That's right."
The evidence also disclosed that the services of travel agents are not consistently available, even assuming they are equivalent. The record reveals that protestants V-K and Vandalia do not pay commissions to travel agents and protestant Mid-American does not pay commissions unless it foresees a certain dollar volume with a particular agency. There is no evidence that such services are in fact provided by protestants. In essence, the P.S.C. seizes upon one statement (see Johnson's testimony above) to support its conclusion that the service proposed by relator could be provided by travel agents. Considering the record as a whole, it cannot be concluded that the asserted provision by travel agents of services similar to those offered by relator is supported *459 by competent and substantial evidence on the whole record.
Another aspect developed from the testimony of the travel agent witnesses was the availability of buses throughout the week during the summer season. The record reveals that in the past, relator has leased buses to some of the protestants for charter trips to alleviate shortages of buses. One travel agent testified that in Jefferson County more buses are needed between the months of May and October. Another travel agent witness testified that he had been refused service by protestant Mid-American for intrastate service during the month of May. There was also testimony by a travel agent that he was forced to rearrange dates and restructure tours as a result of bus shortages. The predictable result of these shortages is that the public is both inconvenienced and forced to utilize equipment of an age and quality not originally desired.
Another important facet of relator's application was the quality of equipment it offered. This was particularly emphasized by supporting charter bus customers. Three witnesses, who in combination represented a senior citizens church group and the American Association of Retired Persons, emphasized the advantages of the service offered by relator during the following testimony:
"Q. Now, with reference to the scheduling and the packaging of the meals and the sight-seeing tours, are you looking for a carrier that will provide all of those things in one package for you?
A. Uh-huh.
Q. That will schedule your stops and sight-seeing and you pay them so many dollars and they do it all?
A. Right.
Q. Is that what Gulf has indicated they would be able to do for you in Missouri?
A. Yes, sir.
Q. In other words, you want more than just transportation. You want someone to put the package together for you and include your meals, your visits to the sight-seeing places you-all would like to visit and include the transportation too in the total price?
A. Yes, sir.
Q. And that's your primary need, I take it, then from your standpoint of your organization and particularly your role as chairman of that committee?
A. Yes, sir. I spend enough time just getting the thing organized without having to do the whole planning of the trip itself.
Q. That's the phase of Gulf's service that you're particularly pleased with in packaging the whole thing together rather than just the transportation aspect of it?
A. That and the equipment that they have.
Q. Have you compared their equipment to the equipment of other carriers?
A. Yes, I have.
Q. What carrier do you considerwell, I represent Greyhound and Continental. Have you compared their equipment with Greyhound's?
A. Yes. But after the treatment I was given by Greyhound over the phone last summer, I'm afraid I wouldn't call them again."
The record also reveals that witnesses emphasized the advantage of relator's St. Louis office. Among the protestants, only V-K has a local office in St. Louis. Protestant Greyhound can be reached for charter bus service through use of an 800 series long distance call to a Chicago office which relays the calls to a coordinating office in Phoenix, Arizona. Protestant-Trail ways employs a similar system. At least one witness testified that her telephone contacts with Greyhound and Trailways were unsatisfactory. Witnesses for senior groups and travel enterprises testified that the location of relator's local St. Louis office and personal contact with St. Louis personnel constituted an advantage over non-local protestant carriers.
Finally, the record reveals, in addition to the service advantages discussed above, that the rates proposed by relator were *460 consistently lower than those of protestants. In its order, the P.S.C. disclosed:
"The rates proposed by Gulf include $1.28 per mile for 38 passenger buses, $1.35 per mile for buses of a capacity of 39 to 43 passengers and $1.40 per mile for buses with a capacity of 44 to 47 passengers. Gulf's deadhead mileage is $.90 per mile. As a result of recent increases, Greyhound's rate for deadhead mileage and for buses of a capacity of 39 to 43 passengers are the same as those of Gulf. Greyhound's published rate for buses of a capacity of 44 to 47 passengers is $1.45 per mile or $.05 higher than that of Gulf. The current rates of Trailways includes a charge of $1.50 per mile for a 39 passenger bus and $1.70 per mile for a 44 to 46 passenger bus. Trailways' deadhead mileage is $1.10. Both Mid-American and V-K charge a weekday rate of $1.27 per mile for a 38 passenger bus and a weekend rate of $1.32 per mile for the same vehicle. Those two carriers' weekday and weekend rates for buses of a capacity of 44 to 47 passengers are $1.45 and $1.50 respectively and both carriers charge $1.10 per mile for deadhead. As a result of the recent fare increases granted to the Missouri intrastate carriers, the current rates are slightly higher than those proposed by Gulf at the time of the hearing."
In response to the evidence that relator offered superior service at lower rates, the P.S.C. and protestants defend denial of operating authority on the ground that no tour had ever been cancelled due to the unavailability of buses. Such a position is based upon the claimed adequacy of existing service. This alone will not sustain a denial of operating authority. Public Water; Household Moving and Storage; and Sawyer, supra. This conclusion is particularly true where the P.S.C. fails to "consider, as a factor indicative of public need, the possible benefits that can be expected from increased competition." Sharron; P.A.K., supra. The preoccupation of the P.S.C. with the adequacy of existing service in the instant case was erroneous and is found not to sustain the order of the Commission. But even if adequacy of service was found to be decisive, it could not rest upon the mere availability of physical equipment. If this court were to adopt "physical availability" as determinative of adequacy as urged by the respondents, then the determination of whether the public convenience would be served would be converted into an assessment of whether entry is "essential or absolutely indispensable". This approach has been rejected before, Beaufort Transfer Co.; State ex rel. Missouri, Kansas and Oklahoma Coach Lines, 179 S.W.2d at 136, supra, and we do so again in the instant proceedings.
The record established that relator offered superior service at rates below those offered by protestants. This uncontested evidence went to the very basis of any proper evaluation of public convenience pursuant to § 390.051, and such evidence amounted to a prima facie showing of public need. Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308, 330 (N.D. Tex.1976).
The effect of affirming the Commission's finding that there was no need for relator's service would be to force charter bus customers to accept services offered by protestants without regard to lower rates, inconvenience and service adequacy as determined by the customers themselves. The Commission's exclusive reliance on adequacy of service and its failure to consider the potential benefits of new competition was error as a matter of law. When coupled with the failure of respondents to adduce competent and substantial evidence on the whole record to counter Gulf's service and price advantages, we must conclude that the Commission's findings and order amounted to reversible error on the issue of need. In sum, the question as to whether relator demonstrated a public need for additional service is answered in the affirmative and it is found that relator's point (2) is sustained in its favor.
Under point (3) relator charges that the findings and conclusions of the Commission in support of its order were unreasonable *461 and unlawful as a matter of law because the record does not show any substantial impact on protestant's charter business in St. Louis, St. Charles and Jefferson Counties which would occur as a result of competition from relator; that the record does not support any need for protestants' regular routes throughout Missouri to be subsidized by charter revenues and profits from St. Louis, St. Charles and Jefferson Counties and that there is no factual or legal justification for requiring charter bus customers in St. Louis, St. Charles and Jefferson Counties to subsidize the regular routes of protestants. Relator's point (3) can be reduced to the simple question: Would the competitive effect of new entry on other charter and regular route service justify the denial of relator's application for a certificate of public convenience and necessity?
Section 390.051.6, RSMo 1978 directs the P.S.C. to give reasonable consideration to the effect proposed service may have upon existing carriers. However, the determination of whether to grant operating authority must be guided primarily by the interest of the public and not by the relative economic advantages or disadvantages of competing carriers. Hunt Transp. Inc. v. I.C.C., 636 F.2d 190 (8th Cir.1980). As we observed previously, "the effect upon other common carriers is to be considered by the Commission, but an adverse effect upon them yields to a public need for the service". State ex rel. Twehous, supra. The fact that business may be diverted from protesting carriers is no argument for denial of an application where the public convenience and necessity would be served by new entry. State ex rel. Churchill Truck Lines, 555 S.W.2d, supra, at 335. Nor is the loss of customers by a carrier itself objectionable since it is the role of the P.S.C. to protect the public interest, not the interest of certified carriers. Midwest Coast Transp., Inc. v. I.C.C., 536 F.2d 256 (8th Cir.1976); Hilt Truck Line, Inc. v. United States, 532 F.2d 1199 (8th Cir.1976). For a similar declaration by our sister state of Minnesota, see Signal Delivery Service, Inc. v. Brynwood Transfer Company, 288 N.W.2d 707 (Minn.1980).
Protestants in the instant proceedings characterize the "policy" of the P.S.C. of subsidizing regular route service with irregular route revenues as "nothing more than a logical and reasonable extension of the obligation to consider the effect which the proposed transportation service will have on existing authorized carriers." In addition, respondents assert that existing carriers "rely heavily upon their charter bus revenue to subsidize their unprofitable regular route operations" and that entry by relator into charter markets would adversely affect the ability of existing carriers to subsidize unprofitable regular route operations.
Considering first the evidentiary aspect of this question, the record revealed a steadily growing demand for charter bus service. The evidence upon this record fails to support protestant's claim of any substantial diversion of irregular route service from protestants to relator. Nor is there evidence in the record that the profitability of Greyhound and Trailways depended upon irregular route revenues. The record also contained an admission by the Regional Director for Trailways that he had no knowledge of the percentage of traffic or revenues which would be diverted if relator was granted authority to operate.
Testimony further revealed that the only regular routes currently unprofitable were two possessed by Greyhound (between Kansas City and Booneville and Kansas City and St. Joseph). There was no evidence how relator's entry would threaten these routes. Nor was there evidence which indicated from what revenue source these "unprofitable" operations were "subsidized".
In the case of the remaining protestants, their position on this issue is even less tenable. Each of these protestants are engaged primarily in charter bus service. The record is devoid of evidence that the extremely limited regular route service of the remaining protestants was subsidized by charter business originating in St. Louis, St. Charles and Jefferson Counties or that any of these protestants would seek to abandon their *462 regular routes upon the grant of authority to relator.
Refusal by the P.S.C. to grant authority to relator based upon the potential effect on protesting carriers is not supported by competent and substantial evidence upon the record herein, nor by the law of our state which directs that adverse effects upon existing carriers must yield to the public need for service. Twehous, supra.
It is evident from our review of the whole record that the refusal by the P.S.C. to grant authority to relator is based primarily on its "preference" for regular route carriers which we have found unsupported in the law.
Whether the competitive effects of new entry by Gulf were sufficient to deny operating authority is answered in the negative and with that answer it is found that relator's point (3) has merit and is sustained to the favor of relator.
For the reasons set forth herein, the judgment of the circuit court affirming the findings, conclusions and order of the P.S.C. is in all respects reversed, and this cause is remanded to the circuit court with directions that the circuit court remand this case to the Public Service Commission for further proceedings consistent with this opinion.
SOMERVILLE, C.J., and PRITCHARD and LOWENSTEIN, JJ., concur.
SHANGLER, J., dissents in separate dissenting opinion.
WASSERSTROM and KENNEDY, JJ., concur in the separate dissenting opinion of SHANGLER, J.
SHANGLER, Judge, dissents.
Gulf Transport Company applied to the Public Service Commission for authority to transport passengers and equipage in intrastate charter service from points in St. Louis, St. Charles and Jefferson Counties to all points in Missouri, and return, over irregular routes. Gulf is a foreign corporation engaged as a regular route common carrier throughout six states. In addition, Gulf has regular authority in Missouri for a one mile route from the Greyhound Bus Terminal in St. Louis to the Mississippi River Bridge where its Illinois route commences. Gulf also holds interstate authority for charter service from St. Louis and its commercial zone, but no intrastate authority in Missouri. Gulf also operates extensively between St. Louis and other points within eastern Missouri interrupted by travel through Illinois and operates de facto from St. Louis to Kansas City by the deposit of the passengers in Kansas City, Kansas, and so imparts to these movements the aspect of interstate commerce.
The protestants to the Gulf application Mid-American Coaches, Inc., Greyhound Lines, Inc., Continental Trailways, Inc., Midwest Buslines, Inc., American Buslines, Inc., V-K Bus Lines, Inc. and Vandalia Bus Lines, Inc.are all motor carriers authorized for both regular route and charter operations within Missouri. The certificates of each of the carriers restrict service between points on the route of another regular route common carrier, or between points on the routes of two or more other regular route common carriers where through or joint service has been authorized under § 390.051.7, RSMo 1978.
There was evidence, and the Commission found, that Gulf used modern highway buses operated by competent and courteous employees, was financially sound, and in all respects qualified to perform the proposed service. The witnesses in support of the application, the Commission noticed, prefer Gulf services becauseamong other reasonsthat carrier furnishes travel and route attractions information other competitors do not. There was evidence also, and the Commission foundas a fact of general concurrencethat charter operations are more profitable than regular route operations. The Commission found also that virtually no patron was unable to secure charter service through existent carriers in the St. Louis area already authorized for that service and, cognately, that the unused capacity of those carriers was ample to accommodate any additional charter demand.
*463 In accordance with these determinations, the Commission concluded there was no need for service proposed by the Gulf application that could not be met by existent authorized carriers.
In accordance with determinations that charter operations are more profitable than regular route operations and so enable the protestant carriers to sustain service on unprofitable regular routes, the Commission concluded that these economic factors dictated that existent regular carriers be allowed access to any additional charter carriage in preference to a new competitor. In the Commission terminology: "[T]he potential for harm to existing carriers, by the creation of the proposed service, more than outweighs any enhancement of existing service for the traveling public." That ground of decision, as the agency report and order acknowledges, implements a developed Commission policy to grant charter rights only as an incident of regular route authority unless regular route carriers manifestly are unable to perform the required charter service.
The conclusions of the report and order explicate these grounds of decision in terms of the statutory authority granted by the legislature to the Commission to determine applications for motor carrier certificates:
"In considering applications for motor carrier authority, such as herein involved, the Commission must follow the mandate of Section 390.051, RSMo 1978, which states in part;
"`4. If the Commission shall find from the evidence that public convenience and necessity will be promoted, or that there is public need for the creation of the service proposed, or any part thereof, and that the applicant is qualified properly to perform the service proposed and to conform to the provisions of Sections 390.011 to 390.176 and the requirements, rules and regulations of the Commission established thereunder, a certificate therefor shall be issued.
`5. In determining whether a certificate should be issued, the commission shall give reasonable consideration to the transportation service being furnished by any common carrier by rail or motor vehicle and the effect which the proposed transportation service may have upon such carriers ....' [emphasis added]
"Since the applicant has been unable to demonstrate any inability, by the existing carriers, to perform requested service, no public need for the creation of the proposed service has been established. In the Commission's opinion, public convenience will not be promoted when the support for new service amounts to mere preference. When the evidence establishes that existing carriers, with unutilized capacity, are conducting some operations at a loss, new service should not be created due to the likelihood that diversion of any amount of traffic will further erode unfavorable economic positions of those carriers.

"The policy of this Commission, in implementing motor carrier regulation, is to perserve, [sic] to the maximum extent possible, the complete transportation system for the entire state, not for a particular area. In furtherance of that goal, the Commission has consistently linked charter operations to regular route authorities. This practice is pursued, even to the extent of cancellation of charter rights from points where regular route carriers terminate operations. This policy is in recognition of the frequent losses resulting from regular route operations, which must be subsidized by the more profitable charter carriage. In the Commission's opinion, it would be an abuse of its discretion to permit the Applicant to subsidize its unprofitable regular route operations in other states by engaging in charter operations in the State of Missouri." [emphasis added]
The majority opinion remands the agency order, as I understand, on grounds that (1) the Public Service Commission was without authority to rest decision on the premise or to formulate a policy on the principle that charter authority issue only as an incident *464 of a regular route operation, unless the regular route carriers are not able to perform the requested service (2) that the record supports only the conclusion of a public need for the Gulf service (3) that a certificate to Gulf for intrastate charter authority spurs competition and hence subserves the public interest by attendant benefits of better service at a lesser cost. The first ground of decision reads the enablements of § 390.051(4) and (5)under which the Commission actedtoo stringently. The second, reassesses the evidence, accords the testimony a tendentious weight, and comes to the conclusions anewan exercise not open to a court on judicial review of a Public Service Commission determination and in contradiction of constitutional and statutory principles. The third, disregards altogether the discretion vested by the legislature in that instrument of government and the strong presumption of the validity owed the exercise of the agency expertise.
For these reasons I dissent.
To come to decision the majority [all without analysis] deprecates the role of the Commission as a policy-maker, denies the agency scope beyond the power the exact words of the statute confers, and then disapprove the Commission order for a standard of decision never employed. The policy premise the Commission applied to the Gulf application [to the extent that consideration prompted the order] was declared by the Commission without equivocation in the preface to the report and order:
"The Commission reiterates its policy of generally authorizing charter rights in conjunction with regular route operations in the absence of a clear showing that regular route carriers cannot perform all requested charter service. [emphasis added]
Then, after recapitulation of the evidence and determination of the facts found: that Gulf and the other carrier witnesses acknowledge that charter operations are more profitable than regular route operations, that the protestant regular route carriers Trailways, Mid-American, Vandalia and others operate at a loss and depend on the charter profits to sustain the total transport operation, that Gulf is not certificated for regular route carriage in Missouri and so cannot be required to service unprofitable regular routes within the state, that there was "virtually no incident where any person has been unable to secure charter service by utilizing the existing authorized carriers in the St. Louis area," but that "the existing carriers generally have unutilized capacity which can be used to handle additional charter work "the Commission gave opinion that "it would be an abuse of discretion to permit the Applicant [Gulf] to subsidize its unprofitable regular route operations in other states by engaging in charter operations in the State of Missouri." The Commission then noted that to grant the Gulf application for charter operations only, a grant to Gulf would require the Commission to grant applications by the regular route carriers [who depend upon the charter subsidy] to abandon unprofitable routesan alternative contrary to the public interest. The Commission then reiterated the policy premise of that ground of denial of the application:
"This, we are unwilling to do, and reiterate our policy of generally authorizing charter rights in conjunction with regular route operations in the absence of a clear showing that regular route carriers cannot perform all the requested charter service." [emphasis added]
The majority opinion, however unwittingly, misstates the Commission policy rationale and so misdirects the judicial review. The opinion poses not the Commission standard, but a truncated account, and reiterates the misconception throughout its exposition:
The opinion thus begins the expoundment at 452:
"The reading of the findings of fact and conclusions of law entered by the P.S.C. in the instant case reveals that the `policy' of not granting irregular route authority where an applicant holds no regular route authority was a decisive factor in the denial of relator's application."
The opinion continues at 453:
"The result of the foregoing declaration of `policy' by the P.S.C. is that entry into *465 intrastate irregular route markets is contingent upon the provision of intrastate regular route service by an applicant before operating authority will be granted.
These recapitulations neglect the condition precedent the Commission imposes for the application of the policy: that regular route carriers cannot perform all the requested charter service. That condition precedent, as the dissent shows, was proven by the evidence and found by the Commission as an adjudicated fact. That distinction is critical because if [as the majority say in dictum] the policy was ineffective as a promulgation of rule for failure to comply with the procedures of § 536.021, RSMo 1978 [Administrative Procedure Act], then the adjudication as a fact that the existent regular carriers are able to perform any request for charter service is substantial evidence to sustain the Commission order to deny the nonregular route carrier Gulf application for a charter certificateas long as, of course, that the Commission exercise is otherwise enabled by statute.[1]
Whatever may prompt the majority cavil at the Commission, an administrative agency can and does make policy.[2]
The Public Service Commission is constituted an administrative agency of the General Assembly entrusted to supervise the operation of common carriers and public utilities. § 386.260; State ex rel. Chicago, R.I. & P.R. Co. v. Public Service Commission, 312 S.W.2d 791, 796[1, 2] (Mo. banc 1958). In the course of function the Commission exercises mingled governmental powers. When the Commission fixes rates or otherwise promulgates for prospective effect a standard addressed to the public or regulated industry generally, it acts like a lawmaker, and so exercises quasi-legislative power. Missouri Southern R. Co. v. Public Service Commission, 279 Mo. 484, 214 S.W. 379, 380[1] (1919). When the Commission determines facts from disparate evidence and applies the law to come to decision in a particular controversy, it acts as an adjudicator, and so exercises quasi-judicial power. State Tax Commission v. Administrative Hearing Commission, 641 S.W.2d 69, 75[10, 11] (Mo. banc 1982); National Labor Relations Board v. Wyman-Gordon Company, 394 U.S. 759, 770, 89 S.Ct. 1426, 1432, 22 L.Ed.2d 709 (1969); R. Shewmaker, Procedure Before, and Review of Decisions of, *466 Missouri Administrative Agencies, 37 V.A. M.S., p. 145 (1953).[3]
An administrative body makes policy in either role, but the persons affected and bound depends upon which function, the quasi-legislative or quasi-judicial, the agency exercises to make the formulation. When the Commission declares a new policy of general application and future effect to implement a statutory standard, it makes law as does a legislaturebut only if done by the rule-making method prescribed by § 536.021 of the Administrative Procedure Act.[4]State ex rel. Beaufort Transfer Company v. Public Service Commission, 610 S.W.2d 96, 99[1-3] (Mo.App.1980). The policy formulated by a rule has the force of law andin the manner of a statuteoperates prospectively to bind all persons within the ambit of regulation, whether or not participant in the rule adoption procedure. § 536.021.5.
The adjudication of an administrative agency also makes policy, if only as a precedent. "`Adjudicated cases may and do ... serve as vehicles for the formulation of agency policies, which are applied as announced therein' and ... such cases `generally provide a guide to action that the agency may be expected to take in future cases.'" N.L.R.B. v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). Or, the adjudication of an agency may represent an emergent policy, still too tentative for promulgation as a formal rule under the statutory procedure.[5] In all events, the adjudication of an administrative body as a quasi-court binds only the parties to the proceeding, determines only the particular facts contested, and as in adjudications by a court, operates retrospectively. N.L. R.B. v. Wyman-Gordon Co., 394 U.S. 759, 765, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969); State ex rel. Summers v. Public Service Commission, 366 S.W.2d 738, 741[1-4] (Mo.App.1963); State ex rel. Consumers Public Service Co. v. Public Service Commission, 352 Mo. 905, 180 S.W.2d 40, 46[6-8] (banc 1944); §§ 386.490 and 386.510. 1 Cooper, State Administrative Law, pp. 177 et seq. (1965); Mayton, The Legislative Resolution of the Rulemaking Versus Adjudication Problem in Agency Lawmaking, Duke Law Journal, Vol. 1980: 103, 118.
*467 In the absence of a statutory restraint, therefore, the choice whether to develop policy by rule, ad hoc adjudication, or both, rests with the discretion of the administrative agency. Securities and Exchange Commission v. Chenery Corp., supra, l.c. 203.
The majority say at 454 that the failure by the Commission to comply with the § 536.021 procedures prevents the Commission statement of a "regular route policy `preference'" from validity as a rule, but even that observance could not "resuscitate the Commission's `policy' where no statutory authority provides for the discretionary exercise of such a `preference'"
I agree that the Commission could not and did notpromulgate a rule by the adjudicated order. That is, whatever the terminology of the report and order, the Commission was without powerby an adjudicationto formulate a "statement of general applicability that implements, interprets or prescribes law or policy" [emphasis added]the § 536.010 definition of rule. That may be accomplished only by the notice, publication and public comment method prescribed by § 536.021. A promulgation of a policy of general applicability is a legislative function and outside the competence of a court or a quasi-court. A court or quasi-court is competent, however, to adjudicate a particular controversy into a precedentand to that extent make policy. Therefore, I agree that the declaration by the Commission in the preamble and then in the body of the report and order of "a policy of generally authorizing charter rights in conjunction with regular route operations in the absence of a clear showing that regular route carriers cannot perform all requested charter service" is not a valid rule, has no lawful effect as a policy of general applicability and cannot bind the regulated public prospectively with the force of law.
I do not agree, however, that the Commission may not consider as a factor relevant to adjudication [and hence as a guide to action the agency may be expected to take in the future] that as a general principle, to ensure the integrity of a statewide transportation system which depends upon profitable charter operations to sustain unprofitable regular route operations, the Commission will authorize a charter right in conjunction with an existent regular routein the absence of a demonstrable inability of regular carriers to perform all the requested charter service. Such an adjudication determines only the particular facts presented, affects only the parties before the agency [except as a precedent, an emergent policy], and operates retrospectivelyall legitimate incidents of a quasijudicial administrative exercise. The order adjudicated in terms of such a consideration avoids effect as a statement of policy of general applicability and prospective operation valid only when promulgated through the rulemaking procedurean incident of the quasi-legislative administrative exercise. Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 201, 67 S.Ct. 1575, 1760, 1579, 91 L.Ed. 1995 (1947); Young Plumbing and Heating Company v. Iowa Natural Resources Council, 276 N.W.2d 377, 383[9] (Iowa 1979).
The report and order of the Commission, then, bears review for validity as any other such decision: that it rest on competent and substantial evidence, is lawful and otherwise reasonableand cognately, that the adjudication be an exercise of power legitimately conferred by statute. State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission, 585 S.W.2d 41, 47[1-3] (Mo. banc 1979); State ex rel. Kansas City Transit, Inc. v. Public Service Commission, 406 S.W.2d 5, 8[3] (Mo. banc 1966); State ex rel. Rice v. Public Service Commission, 359 Mo. 109, 220 S.W.2d 61, 64[2, 3] (banc 1949).
The majority intimate that no statute in express terms confers upon the Commission authority to consider an application for a charter route only as an incident of a regular route [where the regular carrier can fully service the charter business] and so the order to deny [Gulf] application on such *468 a premise has no validity altogether.[6] The majority impose a stricture on the scope and discretion of agency conduct neither the statutes of enablement nor the practical premises of the administrative process requires. The very reason for the legislative delegation of power to an administrative agent is that our kind of government could not function without the delegation. Quite simply [1 K. Davis, Administrative Law Treatise § 3.3, p. 152 (2d ed. 1978)]:
"The kind of government we have compels delegation. The problems of policy, even of major policy, are so extensive that [the legislators] could not conceivably decide them or even write meaningful standards to guide their determination. That is why delegation is inevitable."
It is the function of the agency to fill the interstices of the statutes of enablement by adjudication or promulgation or rules and to evolve standards for that exercise consonant with the broader policy the legislation directs. "The power of an administrative agency to administer a [legislatively] created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by [the legislature]." Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Thus, in addition to "positive powers expressly conferred upon the commission it is also vested with all others necessary and proper to carry out fully and effectively the duties delegated to it." State ex rel. Public Service Commission v. Padberg, 346 Mo. 1133, 145 S.W.2d 150, 151[3] (banc 1940); State ex rel. Kansas City Transit, Inc. v. Public Service Commission, 406 S.W.2d 5, 8[3, 4] (Mo. banc 1966). The very terms of delegation endow a power which transcends the literal text and confers upon the Public Service Commission [§ 386.040]: "also all those powers necessary or proper to enable it to carry out fully and effectually all the purposes of this chapter [The Public Service Commission Law]." In actual effect, then, the statute itself expressly commits a large area of discretion to the Public Service Commission and so "many of its decisions necessarily rest largely in the exercise of a sound judgment." State ex rel. Dyer v. Public Service Commission, 341 S.W.2d 795, 802[8] (Mo. 1960).
Thus, to respond to the majority, of course there is no statute which expressly authorizes the standard the Commission applies to come to adjudication against the application of the nonregular route carrier Gulf, nor in any practical sense, could there be. The Gulf application confronts the public policy declared in § 390.051 that a certificate issues to a motor common carrier only by the Commission determination that "public convenience and necessity will be promoted, or that there is public need" for the proposed service and upon "reasonable consideration to ... the effect which the proposed transportation service may have upon [existent] carriers." That determination is left to the Commission expertise, as informed by a staff current with the technological and economic realities of the industry, and then applied to a set of facts found to carry out the governmental objectives of these statutes. State ex rel. Chicago, R.I. & P.R. Co. v. Public Service Commission, 312 S.W.2d 791, 796[1, 2] (Mo. banc 1958).
The Commission found as facts that charter service is more profitable than regular route service, that the protestant carriers operate regular routes within the state at loss and are sustained by the profitable charter operations,[7] that these existent regular *469 carriers have unused capacity which is available to accommodate any additional charter need, and that there was virtually no incident where a person was unable to secure charter service with an existent authorized carrier in the St. Louis area. On this premise of facts, the Commission determined the application for charter service by Gulf, a nonregular carrier, against the applicant. That adjudication not only determines the facts presented in that proceeding, but serves also as a precedent that on similar evidence that the application for charter service by a nonregular carrier where existent regular route carriers can perform all the requested servicewill be denied.
The majority do not inpugn the determination of factsthat the facts do not rest on competent and substantial evidence but, rather, are uneasy that the adjudication may portend policy. Thus, the majority concludes for itself at 454 "[i]f the instant `policy' is permitted to stand, the effect would be to bar the entry of new competitors into intrastate charter bus markets in our state"again and again praise the salubriousness of competition, disparage the Commission order as heedless of other alternativessuch as tariff adjustments rather than rejection of the Gulf competitionto accomplish the public interest, and then concludes, as a matter of law at 457, "[t]hus, we hold that the failure to consider the potential desirability of competition is enough to compel reversal of a P.S.C. decision under § 390.051."[8]
That ground of opinion both misreads the imperative of the statute and is otherwise an incursion by the court into the discretion and fact-finder function reserved by the law to the Commission.
Neither § 390.051 nor the decided cases ascribe to competition the primacy the majority discerns. The statutes treat the entry of competition to meet the public need and the effect of the competition proposed by the application upon existent carriers as correlativesfirsts among equalsbut both subordinate to the public interest.[9] It is for the Commission to balance these factors, therefore, to come to a sense of the public interest. "The foregoing statutory language as well as the decisional law on the subject dictate that the Commission shall weigh and balance the need, if any, for additional service against the loss of business and consequent adverse effect which *470 will be caused to existing carriers by the grant of an additional certificate to a new carrier." State ex rel. Churchill Truck Lines, Inc., v. Public Service Commission, 555 S.W.2d 328, 334[6-7] (Mo.App.1977). That an existent carrier may lose business to competition does not suffice to determine against the application" if the public generally will be benefited thereby [and] such benefits ... outweigh the damage resulting to the public." [emphasis added] State ex rel. Pitcairn v. Public Service Commission, 232 Mo.App. 755, 111 S.W.2d 982, 987[10,11] (1937). The protection of an existent carrier from new competition as well as the new competition itself, therefore, is each incidental to the public interest, and whether either consideration is more coincident with the public interest is a matter of Commission assessment under the distinctive facts. Pitcairn, supra, l.c. 987[10,11]; State ex rel. Twehous Excavating Company, Inc. v. Public Service Commission, 617 S.W.2d 104, 106[1-3] (Mo.App.1981); State ex rel. National Trailer Convoy, Inc. v. Public Service Commission, 488 S.W.2d 942, 945 [4] (Mo.App.1972).
That the Commission weighed the benefits the new competition of the Gulf application augured against the damage to the incumbent carriers such an entry would inflict to come to a balance in favor of the statewise public interest to deny the Gulf request is evident from the report and order. The Commission noted that Gulf operates modern buses, employs competent personnel, and is experienced in the charter service field. It maintains a charter sales office in St. Louis, an amenity duplicated by only one of the protestant carriers [who are available by toll-free or local telephone number], furnishes complete travel information [restaurants, menus, attractions along the route, etc.], and charges less than do some of the protestant carriers. The Commission found that "[g]enerally speaking, all of the individuals supporting the application seek the service of Gulf because of the additional information that can be obtained about attractions in route and the prices charged. Most of the witnesses appeared unfamiliar that the travel agencies perform that service at no additional compensation since they are paid on a commission basis from the proceeds of any fares, admissions or charges arranged."
The Commission also found, on the other hand, thatwith minor exceptionthe charter service given by the existent carriers has been consistently satisfactory. The Commission found also: "The evidence in this matter establishes virtually no incident where any person has been unable to secure charter service by utilizing the existing authorized carriers in the St. Louis area. In addition, it appears from the evidence that the existing carriers generally have unutilized capacity which can be used to handle additional charter work." Onto the scale the Commission then cast these considerations of weight: [From the report and order]"The evidence in this matter establishes that a number of the carriers operating in Missouri are operating at a loss on their regular routes and some carriers even at a loss overall." [From the conclusions] "[T]he frequent losses resulting from regular route operations ... must be subsidized by more profitable charter carriage." [From the conceded evidence]That Gulf operated no regular route in Missouri and sustained no loss from an imposed obligation of service to subsidize. The Commission then struck this balance in the public interest: [From the report and order]"In the Commission's opinion the potential for harm to existing carriers, by the creation of the proposed service, more than outweighs any enhancement of existing service for the traveling public."
The majority say, nevertheless, that the Commission neglected to consider other alternatives [such as tariff adjustments] to protect the incumbent carriers from undue loss so as to allow the public the benefit of the Gulf new competition and at the same time preserve the economic health of the protestantsso that the order to deny the Gulf application, if for no other reason, was valid neither as an adjudication nor as an emergent policy. In the language of the majority at 455:

*471 [T]he issue herein ... is whether the cross-subsidy policy of the P.S.C. is a permissible means of realizing its statutory obligation. If the position of the respondents were upheld and this court were to approve a policy of protectionism as necessary to guarantee adequate regular route revenues, we would be ignoring the comprehensive rate-making authority of the Commission under § 390.041, RSMo 1978. Even if we were to assume the present regular route tariffs are insufficient, the Commission can review such tariffs and act accordingly. This is a much more precise and far less intrusive approach than that of barring entry of other irregular route operators on the premise that regular route authority is a prerequisite to the grant of a charter bus operating certificate.
That synopsis of the Commission adjudication is mistaken as a matter of fact and the power of a court to deal with it on the grounds asserted is mistaken as a matter of law.[10] The Commission implicitly considered, not only the tariff structure, but also the abandonment of heavily unprofitable regular routes as an alternative to the denial of the Gulf and other like applications for charter service by nonregular route carriers. The conclusions of the Commission state: "[T]o ... create additional competition for charter revenues being enjoyed by the carriers performing regular route service would necessitate liberalization of attitude in applications to abandon unprofitable routes. This, we are unwilling to do ... All carriers could, undoubtedly, render charter service at lower rates if unprofitable regular routes could be entirely eliminated. In the Commission's opinion, subsidization of regular route service by charter operations is more in the public interest than wholesale termination of unprofitable regular routes." The evidence was clear that the V-K St. Louis to Vienna route could be maintained only because sustained by its charter operationsand even the Vandalia route reduced from St. Louis to Piedmont to St. Louis to Ironton was not fully sustained even with the charter profits. The Commission noted that Gulf was immune from regular route losses in Missouri simply because it was not a regular intrastate carrierso that a charter certificate would serve to subsidize the Gulf outstate regular operations by intrastate profits. To say, as does the opinion, that the Commission neglected its rate obligation under § 390.041 to cure the regular route financial deficiencywhen to raise the rates on routes already underused inevitably leads to less useis to say that the Commission was under duty to ensure the abandonment of the lines by the exercise of the rate power, an alternative it refused itself by other means as contrary to the public interest.
That lapse of fact apart, the opinion disconcerts the more because of its heedless incursion into the administrative prerogatives of the Public Service Commission. The majority recite a primer of maxims as to the acceptable scope of judicial review but then simply do as they will. Thus, the majority advises the Commission not only that "the Commission can review such tariffs and act accordingly" [in order to offset any loss from the Gulf competition], but also expresses that preference as a means to determine whether the public interest is served by a certificate to Gulf: "This is a much more precise and far less intrusive approach than that of barring entry of other irregular route operators on the premise that regular route authority is a prerequisite to the grant of a charter bus operating certificate." That is an exercise not open to a court. The legislature has entrusted that aspect of the common carrier regulation to the Public Service Commission, and not to a court [State ex rel. Chicago, R.I. & P.R. Co. v. Public Service Commission, 312 S.W.2d 791 (Mo. banc 1958) l.c. 796[1, 2]:

*472 The public service commission is essentially an agency of the Legislature and its powers are referable to the police power of the state. It is a fact-finding body, exclusively entrusted and charged by the Legislature to deal with and determine the specialized problems arising out of the operation of public utilities. It has a staff of technical and professional experts to aid it in the accomplishment of its statutory powers. Its supervision of the public utilities of this state is a continuing one and its orders and directives with regard to any phase of the operation of any utility are always subject to change to meet changing conditions, as the commission in its discretion, may deem to be in the public interest. Courts of review perform no such function. They do not examine the record under review for the purpose of determining what order they would have made. As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere. [emphasis added]
In that exercise of delegated authority, the Commission acts in the public interest, and not in the interest of any nascent competitor carrier or existent carrier, but applies an expertisein continuous evolvementto ensure as efficient a transportation system for the entire state as circumstances allow. Union Electric Company v. City of Crestwood, 499 S.W.2d 480, 482[1] (Mo.1973); State ex rel. National Trailor Convoy, Inc. v. Public Service Commission, 488 S.W.2d 942, 945[4] (Mo.App.1972).
Thus, whether the Commission in the consideration of an application for a route certificate shall accomplish the entrusted task to promote an efficient statewide transportation systemand hence the public interest by a tariff allowance [an alternative rejected by the commission], or by curtailment of service on a particular nonprofitable route [an alternative used], or by an abandonment of that route altogether [an alternative rejected], or by refusal to allow nonregular carrier a certificate for charter operation while existent carriers remain with capacity to fully perform that service involves complicated questions of technical fact and legislative value beyond the competency of a court to assess in the first instance. To fashion a consistent standard on this balance of considerations, the Commission allows even a regular carrier charter authority only as an incident of the regular routeor between points on the routes of two or more regular route carriers where the through or joint service has been authorized.
The majority set aside the Commission order on grounds that the emergent policy of the adjudication has no statutory support and, incidentally, that the neglect by the Commission to accord the need for competition primacy as a consideration in the determination of the public interest amounts to an abuse of discretion. The dissent demonstrates that the adjudication is supported by competent and substantial evidence, and so is valid on its own terms, and as a valid precedent suffices as a basis for a policy which augurs that like evidence will result in a like adjudication. The dissent demonstrates also that in fact the Commission assessed the need for new competition along with the other considerationswhich is all the law requiresand came to a balance of the public interest. The majority would have come to a different conclusion. That is not enough, however, to nullify an order of the Commission which otherwise rests on competent and substantial evidence, is reasonable, and otherwise authorized by law. State ex rel. Missouri Water Company v. Public Service Commission, 308 S.W.2d 704, 713[2] (Mo.1957). Nor does a court of review have authority to weigh the evidenceas do the majorityon an appeal from an order to grant or deny a certificate of public convenience and necessity to a carrier. An order of the Public Service Commission bears a strong presumption of validity and the challenger must show convincingly that the decision is not lawful and *473 reasonable. Smith v. Public Service Commission, 351 S.W.2d 768, 772[4] (Mo.1961); State ex rel. Inman Freight System, Inc., v. Public Service Commission, 600 S.W.2d 650, 654[1-3] (Mo.App.1980). The majority rationale does not sustain that quantum.
The report and order of the Commission denied the Gulf application on the separate ground that there was no public need for that service. "From the evidence in this matter, the Commission cannot find that there is any need for service, embraced by this application, that cannot be fulfilled by existing authorized carriers."[11]
The majority rejects this ground of adjudication as well for the combined reasons that at p. 460: "The Commission's exclusive reliance on adequacy of service and its failure to consider the potential benefits of new competition was error as a matter of law." The majority do not say whether that error was a want of reasonableness, an abuse of discretion, or disregard of statute.
On actual analysis, the majority simply is wrong that the Commission "fail[ed] to consider the potential benefits of new competition." The dissent has dealt with that same contention already, and that discussion applies with equal validity to dispel this ground of opinion as well. What the majority meanas is evident from the use it makes of the terminology of cited cases [State ex rel. Twehouse Excavating Company, Inc. v. Public Service Commission, 617 S.W.2d 104 (Mo.App.1981), most prominently]is that they would have determined in the first instance [and actually do on the appeal], that the new competition subserves the public interest more nearly, and hence public need, than does the preservation of the solvency of existent carriers. That, however, is a balance confided to the discretion of the Commission. State ex rel. Inman Freight System, Inc. v. Public Service Commission, 600 S.W.2d 650, 655[8] (Mo. App.1980). The majority merely prefer to find the facts for themselves. The reversal of the Commission order because "exclusive reliance on adequacy of service" to find a lack of public need for the Gulf certificate, also upon analysis, is simply a euphemism for disagreement with the administrative determination of the evidence. The adequacy of service, obviously, was not the exclusive basis for the public need adjudication. In clear terms, the Commission iterates [report and order, pp. 10 and 11], and then reiterates with amplitude [conclusions, p. 12]:
Since the Applicant has been unable to demonstrate any inability, by the existing carriers, to perform the requested service, no public need for the creation of the proposed service has been established. In the Commission's opinion, public convenience will not be promoted when the support for new service amounts to mere preference. When the evidence establishes that existing carriers, with unutilized capacity, are conducting some operations at a loss, new service should not be created due to the likelihood that diversion of any amount of traffic will further erode unfavorable economic positions of those carriers.
Thus, the public need determination of the Commission rests also on a balance of economic hardship on existent carriers and, hence, as the Commission conclusions express, on a danger to the "complete transportation system for the entire state."
The majority reassess the evidence to undo the Commission order. The Commission found that Gulf uses 61 modern highway buses, about half of them based in St. Louis during the summer, and has six more on order. Gulf also has a charter sales office in St. Louis. Like most carriers, the Gulf charter business burgeons from May through October, and during that period in year 1979, all Gulf buses were committed or *474 sold out. Gulf vice-president McIntosh conceded that he could not tell whether any more service could be provided on weekends. Gulf also furnishes to prospective charters travel information, such as choices of restaurants and menus, and the cost of admission to roadside attractions at places of stop.
There was evidence none of the protestant carriers except V-K had a charter office in St. Louis. Greyhound recently closed such an office in St. Louis, and now handles the business by a toll-free number to the Chicago office. This arrangement allows Greyhound to use its equipment more efficiently and reflects the practice that, even when the St. Louis office functioned, more than 90 percent of the charters were arranged by telephone. Greyhound usually keeps 28 to 40 buses available for charter work at a St. Louis equipment point. Trailways keeps about 15 buses for that service and increases the number when sales indicate the need. Trailways solicits charters, as does Greyhound, by nationwide advertisements and by direct mail to travel agents. Mid-American is sited in Washington, Missouri, and has available from 30 to 36 buses for charters, most of them older than the Gulf equipment but in good repair. Mid-American uses a St. Louis telephone directory for direct calls to the Washington office. V-K has St. Louis headquarters and has 17 buses available for its charter activity. Vandalia is sited in Caseyville, Illinois, some nine miles from St. Louis, and has some 18 buses available for charter service. Vandalia also uses an exchange number in the St. Louis directory and advertises extensively in the yellow pages for charter business. Except for Greyhound [when all charter equipment was committed or sold out on three occasionsfor a Missouri-Texas football game, and the visit by the Pope to Chicago and Des Moines], none of the protestant carriers had to refuse a charter because equipment was unavailable. The protestant bus equipment, although in some instances not as modern as that used by Gulf, was described by repeated evidence as comparable to that offered by Gulf, as was the service.[12] The evidence was also that no request for charter service was denied by the incumbent carriers for lack of equipment.
The report and order of the Commission noted that "[g]enerally speaking, all of the individuals supporting the application seek the services of Gulf because of the additional information that can be obtained about attractions in route and the prices charged. Most of the witnesses appeared unfamiliar with the fact that the travel agencies perform that service at no additional compensation since they are paid on a commission basis from the proceeds of any fares, admissions or charges arranged." [emphasis added]. The Commission found that the rates between Gulf and the protestants were in some cases, higher, lower or comparable. The Commission found also that there was virtually no instance when a person was unable to secure charter service from among the existent carriers in the St. Louis area, and that those carriers already authorized for charters have unused capacity for additional charter work. The Commission then concluded: "From the evidence in this matter, the Commission cannot find that *475 there is any need for service, embraced by this application, that cannot be fulfilled by existing authorized carriers."
The majority dispute the evidential basis for the finding of fact that the route information service furnished by Gulf was available to any traveler from a travel agent, free of cost. The opinion rescripts a span of testimony at p. 458 by Gulf witness travel agent Johnson to conclude that such testimony was too "meager" and "not accompanied by any other evidence in the record" of such a practice. The opinion reinforces that conclusion with a rescript of testimony at p. 458 from Ms. Kemmy, a Catholic group representative, to the effect that a trip arranged personallyrather than through a travel agencysaves $4 to $5 the person. The majority then disposes of the Commission finding on the basis that at p. 458: "In essence, the P.S.C. seizes upon one statement (see Johnson testimony above) to support its conclusion that the service proposed by relator could be provided by travel agents. Considering the record as a whole, it cannot be concluded that the asserted provision by travel agents of services similar to those offered by relator is supported by competent and substantial evidence on the whole record."
The record, more fully disclosed, however, shows clearly that Johnson more fully testified on cross-examination;
Q. Let me ask you about your particular aspect of the operation of a total charter package. As Mr. Douglas was asking you, you arrange an itinerary and I guess lodging, visits, meals, and what have you for a particular preformed group; is that correct?
A. Yes, sir.
Q. And you also arrange the transportation services?
A. Right.
Q. Now, as far as the group is concerned, is your compensation any the price that they must pay you, is that taken out of the overall rates for transportation or is it an additional charge for those groups? I'm not sure how that's settled.
A. Any package tour you get, your revenue from the Commission is given to you by each particular aspect of the tour like hotels, buslines.

Q. So, an individual like, for example, Mrs. Kemmy who testified here earlier, if she were to make the individual arrangements with the hotels, the eating places, the buslines, or if she were to go to you and have you do it, the price that she sees, bottom line, would not change then, would it?
A. No. Most people have the conception that doing it themselves they save money.
[emphasis added]
This evidence was reinforced by Greyhound District Manager Kyle who explained that Greyhound pays the travel agent a commission for every charter tour arranged with that carrier.
The Commission finding of fact rests on substantial evidence and cannot serve as a ground to discredit the order entered against the Gulf application for want of a public need.
The final ground of the majority to set aside the Commission denial of the Gulf application reformulates the contention of that carrier on appeal that the record does not show any substantial impact on the charter business of the protestants in the area of proposed certification, nor any justification that the charter customers in St. Louis, St. Charles and Jefferson Counties should subsidize the regular routes of the protestants. The contention asserts parochial considerations. The duty delegated to the Commission is a power to regulate common carriers in the public interest statewide [§ 390.041], an authority which transcends local bournes and concerns, to ensure uniformly adequate, sustained and complete transportation system for the entire state, and not for a limited area. The evidence abounds [and Gulf agrees] that charter operations are more profitable than regular route operations, that the protestant charter service sustains unprofitable regular *476 route operations, that the diversion of charter business would undermine the integrity of the protestants to service their regular routes, and in the specific case of Vandalia, the incursion of new charter competition would aggravate the "tremendous loss on [its] regular run that [it] cannot shake."
The order of the Commission is supported by competent and substantial evidence, is reasonable and otherwise lawful. I would sustain it.
NOTES
[1] The commercial zone is an area identified as St. Louis City and a 15-mile radius from the corporate limits of St. Louis embracing portions of St. Louis, St. Charles, and Jefferson counties.
[2] Now § 390.116, RSMo 1978.
[3] Neither research of this court nor counsel for the Commission in oral argument disclosed any express statutory support of the Commission's regular route "preference".
[4] For a statement of the theory underlying the regulation of "natural monopolies", as compared to the motor carrier industry, see R. Baron, Jurisdiction of the Public Service Commission, 34 J.Mo.Bar 27, 34 (1978).
[5] See S. Breyer, Analyzing Regulatory Failure: Mismatches, Less Restrictive Alternatives and Reform, 92 Harv.L.Rev. 549, 556-57 (1979).
[1] The majority then insinuates another distraction from a fair consideration of the Commission rationale as actually implemented in the order. The opinion attributes to the Commission, and then refutes, certain terminology and statutory citation employed by counsel in the course of briefs and argument, and not by the Commission. The majority invokes the recognized right of a court to review an administrative order reached by an erroneous view of the law free from any constraint of the agency interpretation to comment and conclude at 453:

"Where, as in the instant proceedings, the P.S.C. `recognizes a preference for the motor carrier service provided by a regular route carrier,' such pronouncement is of no importance if upon analysis of the statutory law of this state, a reviewing court reaches a different conclusion. The P.S.C. urges this court to extrapolate from the language of § 390.051(8) a preference for regular route service... The foregoing section has been considered by this court in State ex rel. Phillip[sic] v. Public Service, 599 S.W.2d 82... This court concludes that neither the language of § 390.051(8) nor the rule in State ex rel. Phillip, [sic] either directly or by implication, authorize the P.S.C. to recognize ... `a preference for a regular route carrier' and by such recognition establish a policy that an applicant for an irregular route operating certificate must furnish regular route authority as a condition precedent."
The report and order of the Commission, nor any prefatory declaration of policy, nor any other comment mentions § 390.051.8 or "a preference for regular route carriers" or that the cited section implies the preference in those terms. The terminology and citation of statute are employed by counsel to make an analogy. A court reviews the order of the Public Service Commission, not the arguments of counsel, to assess the validity of the agency action. State ex rel. Kansas City Transit, Inc. v. Public Service Commission, 406 S.W.2d 5, 11 [10-12] (Mo. banc 1966).
[2] The term policy in this usage connotes a governmental practice or rule exercised according to the perceived public interest objective involved. [Dille v. St. Luke's Hospital, 355 Mo. 436, 196 S.W.2d 615, 619[2,3] (1946)] in this case, according to the purposes of the matrix of The Public Service Commission.
[3] An order of the Public Service Commission such as the Gulf application for irregular route certificateissues only after hearing [§ 390.051.3] and so is governed by the contested case procedures defined in the Administrative Procedure Act [§ 536.090, among them] and therefore is, by definition as well as fact, "a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing." § 536.010(2) of Definitions. State ex rel. St. Louis Public Service Company v. Public Service Commission, 365 Mo. 1032, 291 S.W.2d 95, 98[2] (Mo. banc 1956); State ex rel. Hotel Continental v. Burton, 334 S.W.2d 75, 87[7] (Mo. 1960). Such an order falls within the Article V § 22 ambit which requires judicial review of all "final ... orders of any administrative officer or body ... which are judicial or quasi-judicial and affect private rights." State ex rel. St. Louis Public Service Company, supra, l.c. 101[7-10]; State ex rel. Missouri Water Co. v. Public Service Commission, 308 S.W.2d 704, 713[2] (Mo. 1957); F. Davis, The Missouri Public Service Commission, 42 U.M.K.C.L.Rev. 279, 285 (1974).
[4] A rule means "each agency statement of general applicability that implements, interprets, or prescribes law or policy ...." § 536.010(4). The rule-making procedures of § 536.021 are designed to allow general participation by all those who may be affected or regulated by the rule, and so ensure that fairness.
[5] The exercise by an administrative agency of the adjudicative function to evolve a policy case by case, ultimately to be embodied in a legislative rule, is authoritatively recognized: "Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective ... There is thus a very definite place for the case-by-case evolution of statutory standards." Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1760, 1580, 91 L.Ed. 1995 (1947); General Development Corporation v. Division of State Planning, 353 So.2d 1199, 1209[11-13] (Fla.App.1977); Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 927 (1965).
[6] The majority observe at p. 454 n. 3: "Neither research of this court nor counsel for the Commission in oral argument disclosed any express statutory support of the Commission's regular route `preference,'"and then decide at p. 455: "This court concludes that there is no statutory basis for permitting the P.S.C. to deny the relator the authority to operate an irregular route on the ground that relator holds no preexisting regular route authority. The order of the P.S.C. was based on a `policy' which has no statutory support. Such `policy' is found to have no application to the instant proceedings, nor to relator herein, and is held inapplicable and void."
[7] The protestant Greyhound during 1979the year which preceded the Commission hearing on the application, sustained a net loss of $566,898 on its Missouri operations. The regular routes between Kansas City and St. Joseph and Kansas City and Boonville were especially unprofitable. These, and the other unprofitable regular routes were sustained by the Missouri charter operations.

The protestant Trailways also operated some regular routes within Missouri at a loss and depends upon the charter operations to sustain those regular routes.
The protestant Mid-American has operated its regular routes at a net loss since year 1975 and for year 1979, the regular route loss was $65,999. The profit from the charter operations, however, resulted in a net income of $108,688, before taxes and interest, for that year.
The protestant V-K, a small scale motor carrier, operates a regular route between St. Louis and Vienna and suffered a net loss of $6,023 for year 1979. Even with the benefit of the charter profits, V-K operated at a net loss that year.
The protestant Vandalia formerly operated a regular route from St. Louis to Piedmont, but the route was reduced to St. Louis to Ironton, two days a week, because of reduced patronage and continued losses. The actual regular route loss for year 1979 was $28,378and exceeded revenues from the charter operations along the route.
[8] The majority rationale that the potential benefits of competition is the most dominant single consideration as to whether a certificate should issue to a carrier under § 390.051 pervades the entire opinion expositionit applies to nullify the Commission assessment that the Gulf presence to serve charters only will undermine the regular route structure throughout the state and recurs to decide that the Commission determination that there was no public need for the Gulf service was an abuse of discretion.
[9] § 390.051.6 provides:

In determining whether a certificate should be issued the commission shall give reasonable consideration to the transportation service being furnished by any common carrier ... and the effect which the proposed transportation service may have upon such carriers; provided, that the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing.
[10] I overlook the persistent tendency of the majority opinion to condemn the Commission adjudication as protectionism or as some other variety of arbitrary practice. The careful balance of the evidence the report and order display as well as the discretion applied dispel that notion. Whether a court endowed with the authority to find the facts and apply a legislative discretion might reasonably disagree is another matter.
[11] In response, the majority note at p. 455: "In drawing this conclusion, the P.S.C. interpreted `public convenience' to require a showing that `there is a failure, breakdown, incompleteness or inadequacy in the existing facilities.' " That statement appears nowhere in the report and order, conclusions or any other rendition by the Commission. It derives, actually, from the brief of counsel on appeal. We review the report of the Commission and not an assertion of counsel.
[12] Gulf witness Evelyn Cornwell of the American Association of Retired Persons in St. Charles County testified she thought the Greyhound equipment was comparable to that used by Gulf, as was that used by Trailways. The Mid-American air conditioner did not function effectively on one trip, but that would not discourage her use of that service in future. She preferred Gulf, however, because she was familiar with their equipment from other tour episodes.

Gulf witness Miller Johnson, Travel Center, Inc.travel agencyemployee, testified he would continue to use Greyhound, Mid-American, Trailways and Vandalia even if Gulf were certificated. He found Mid-American equipment very good, and their quality of service excellent, and the Vandalia and V-K service comparable to that provided by Gulf.
Gulf witness Jerry Cornish, an employee of Liberty Tours, has used both Gulf and Mid-American to arrange charter tours, and has found Mid-American and Gulf very comparable and Mid-American "very acceptable."
Gulf witness William Schmitt, group tour specialist with Travel Center, Inc., prefers both Gulf and Mid-American because "the service from both those carriers had been excellent."