**STATE ex rel. EMPIRE DISTRICT
ELECTRIC COMPANY,
Plaintiff-Respondent.**

**v.**

**PUBLIC SERVICE COMMISSION of
the State of Missouri,
Respondent-Appellant.**

**No. 13696.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 28, 1986.

Motion for Rehearing or Transfer
Denied June 18, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Edward J. Cadieux, Deputy Gen. Counsel, Public Service Com'n of Missouri, Jefferson City, for respondent-appellant.

W.R. England, III, Vicki J. Goldammer, Hawkins, Brydon & Swearengen, Jefferson City, for plaintiff-respondent.

HOGAN, Presiding Judge.

In this ratemaking case, the Empire District Electric Company (Empire or the Company), a privately-owned utility, sought an add-back of $4,091,895 to its jurisdictional rate base. The sum which Empire sought to add back represents, according to Empire, accumulated deferred taxes created primarily by the use of accelerated depreciation as first authorized by the Revenue Act of 1954, Pub.L.No. 83–591 § 167, 68A Stat 51 (1954), and in lesser part by the Investment (Job Development) Tax Credit deduction first authorized by the Revenue Act of 1962, Pub.L.No. 87–834 (1962). The Commission received testimony and numerous exhibits. Upon the recommendation of its Staff auditors, the Commission treated the deferred *tax* reserves related to accelerated depreciation for the period 1954 through 1973 as a *deduction* from rate base and the deferred taxes related to ITC for the period 1963 through 1970 as a *deduction* from the rate base, except that part of the reserves attributable to the period February 1958 through June 1963. By its Report and Order dated June 17, 1983, the Commission found the Company's jurisdictional rate base to be $151,963,087 for electric operations, found that Empire's net operating income requirement was $16,-336,032, and found that the fair value rate of return which would produce this revenue requirement was 10.75 percent, which the Commission found to be fair and reasonable.

Empire timely filed an application for rehearing, the substance of which was that the Commission had ignored its own decision in Re The Empire District Electric Company, Case No. 13,723, 22 PUR 3d 399 (Mo. 1958), wherein the Commission fixed the Company's elements of cost of service, and that the Commission was, by the force of § 386.490, RSMo 1978, required to regard that case as controlling so far as the add-back is concerned. Empire further contended that the Commission acted contrary to the overwhelming weight of the record evidence, arbitrarily excluded certain evidence, that it would be inimical to public policy not to allow the add-back to its rate base, and the rate of return allowed on the reduced rate base is confiscatory. On July 6, 1983, the Commission denied the application for rehearing.

The Company thereafter filed a petition for review, as authorized by § 386.510, RSMo 1978, in the Circuit Court of Jasper County. The circuit court affirmed that part of the Commission's order which *excluded* accumulated deferred taxes associated with accelerated depreciation during the period 1954 through 1958, and ITC accumulated from July 1, 1963, through December 31, 1970. It reversed that part of the Commission's order refusing to deduct accumulated taxes allocable to the period July 1, 1963, through December 31, 1973, and remanded the cause to the Commission "for further action not inconsistent herewith." In effect, the trial court ordered the Commission to add back $3,817,780 to Empire's rate base *at the same rate of return* as the other items which make up the capitalized rate base. The Commission thereafter timely appealed to this court. Having carefully reviewed the record at length, we conclude the Commission's order should be reinstated without modification. The primary principle upon which our decision is based is that a utility's accounting procedures cannot dictate ratemaking policies. *Alabama-Tennessee Natural Gas Company v. Federal Power Commission,* 359 F.2d 318, 336 (5th Cir.1966), cert. denied, 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966), reh. denied, 385 U.S. 964, 87 S.Ct. 390, 17 L.Ed.2d 310 (1966). This principle is subject to at least one important exception, which we will note in the course of the opinion.

■ To step back a moment, we have, of course, been required to consider the jurisdiction of the Circuit Court of Jasper County and the jurisdiction of this court of the appeal. Section 386.510, RSMo 1978, in terms provides that "... the applicant [for review] may apply to the circuit court of the county where *the* hearing was held or in which the commission has its principal office for a writ of certiorari or review." (Emphasis ours.) The statute is ambiguous, in a sense, for the language thereof does not specifically address situations in which hearings have been held at more than one place. We find from the record, however, that a formal public hearing was

held in Joplin, Missouri, on February 14, 1983, upon order of the Commission. Such being the case, the applicant's petition for review was properly brought in Jasper County, even though other hearings were conducted at the Commission's office in Jefferson City. The appeal is properly here. *State ex rel. Utility Consumers Council v. Public Service Commission,* 562 S.W.2d 688, 692[1] (Mo.App.1978), cert. denied, 439 U.S. 866, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978), and see *State ex rel. Case v. Seehorn,* 283 Mo. 508, 530, 223 S.W. 664, 670–71 (banc 1920). Further, we note that we review the order entered by the Commission and no deference to the determination of the circuit court is required. *State ex rel. Ashcroft v. Public Service Commission,* 674 S.W.2d 660, 662 (Mo.App.1984); *State ex rel Public Water Supply District No. 8 of Jefferson County v. Public Service Commission,* 600 S.W.2d 147, 149[1] (Mo.App.1980).

Our review of the Commission's Report and Order is limited to a determination whether it is (1) lawful and (2) reasonable. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission,* 585 S.W.2d 41, 47 (Mo.banc 1979); *State ex rel. Gulf Transport Company v. Public Service Commission,* 658 S.W.2d 448, 452 (Mo.App.1983). However, the Commission's order is considered to be prima facie correct and the complaining party carries the burden of making a convincing showing that the Commission's order is not reasonable or lawful. Section 386.430, RSMo 1978; *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission,* 606 S.W.2d 222, 223 (Mo.App.1980), cert. denied, 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981). We agree with Empire's premise that while we may not substitute our judgment for that of the Commission, we may and should decide if the Commission could reasonably have made its findings and reached its decision by consideration of all the evidence presented. *State ex rel. Gulf Transport Company v. Public Service Commission,* 658 S.W.2d 448, 452. As a substitute for

citation of authority, and after this court ordered correction of the Commission's brief, the Commission has suggested that "The parties before the Commission were in agreement that if tax-timing differences associated with the deferred reserves were accorded tax normalization treatment for ratemaking purposes, then deduction from the rate base is proper, and, conversely, if tax-timing differences involved were treated on a flow-through basis for ratemaking purposes, then deduction of the associated deferred reserves from rate base were not warranted." We find no such "agreement" in the record at the place cited, and in any case, decisions of administrative agencies, including the Commission, based on their interpretation of the law are matters for the independent judgment of the reviewing court, and are subject to correction when they are erroneous. *Daily Record Company v. James*, 629 S.W.2d 348, 351 (Mo.banc 1982); *State ex rel. Gulf Transportation Company v. Public Service Commission*, 658 S.W.2d at 453.

A quotation from an elementary text is appropriate to put the subject matter of the appeal in perspective.

"Under the Revenue Act of 1954, business firms are permitted to adopt accelerated depreciation in calculating taxable income, thereby charging higher depreciation expenses in the early years of the service life of assets than would be allowed under straight line depreciation and lower rates in later years. The effect is to produce lower tax payments with respect to the early years which are offset by increased tax payments in the remaining years. The act [has] posed a problem for the regulatory commissions: should they include, for rate-making purposes, as operating costs the higher income taxes to which utilities would be subject were they to report taxable income on a straight line basis ('normalization' method) or should they include only the taxes actually paid ('flow-through method') by the utilities?"

C. Phillips, The Regulation of Public Utilities 267–68 (1984) [hereinafter Phillips]. To the extent it is possible to distinguish desirable or required *tax accounting principles* applicable to regulated utilities from those accounting principles in the context of ratemaking, we forego any discussion of particular accounting systems. Such a discussion is well beyond the scope of this opinion and probably any other opinion of conscionable length.[1]

The Western District addressed "normalization" and "flow-through" as applied to ratemaking in *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d 222. Using an illustrative example taken from the Commission's brief, our colleagues explained, 606 S.W.2d at 224:

"By 'normalization,' which was allowed in the present case, the income tax expense item allowed to be deducted in arriving at cost of service are not the taxes *actually paid,* but are the amount which *would have been paid* had the straight line depreciation method been used in figuring the income taxes. For the test year now under examination, the accelerated depreciation method resulted in an income tax deferral of $5,474,678 over the amount which the straight line depreciation method would have produced. This deferred amount was credited to a 'deferred tax' reserve. In later years, when the depreciation deduction is less than the straight line method would yield, and the resulting taxes more than the straight line method would have produced, the excess tax will be deducted from the reserve...."

The court then went on to say, 606 S.W.2d at 224:

"The 'deferred tax reserve,' to which the deferred amounts are credited, is an unfunded reserve. It creates, while it is in existence, a cost-free addition to capital.... The amount of [the reserve] is

---

1. For a general discussion, see R. Hahn and G. Aliff, Accounting for Public Utilities, Chapter 17 (1984) [hereinafter Hahn & Aliff].

excluded from the rate base so the rates charged to the ratepayers do not include a return upon the reserved amount. The reserve therefore inures to the benefit of the ratepayers in that the rates do not reflect any cost for the use of the money. This feature provides an immediate benefit to the ratepayers."

By contrast, the court defined "flow-through" to denote a system of accounting by which the income tax component is the amount of income tax actually paid. 606 S.W.2d at 225.

A similar comparison or contrast between the application of "normalization" and "flow-through" principles to regulated utility rates was made by the Fifth Circuit in *Alabama-Tennessee Natural Gas Company v. Federal Power Commission*, 359 F.2d at 326–27:

"In the FPC's 'rate base-rate of return' system the ratepayers of a regulated utility pay a rate sufficient to return to the utility the cost of service plus a specified rate of return on the utility's capital investment ... [w]hen the [accelerated] depreciation is normalized, the ratepayers are charged not the actual income taxes paid but a hypothetical larger figure for the taxes computed as if depreciation were figured on a straight-line basis. The difference between the actual taxes paid and the larger hypothetical amount ... is accumulated in a 'deferred tax' account. The funds [represented by] this account are available to the company as working capital free of any charges for interest or dividends. ... Under the flow-through treatment of liberalized depreciation, the ratepayers reimburse the utility for federal income taxes the regulated utility actually pays."

Yet another description or contrast between "flow-through" and "normalization" accounting procedures as applied to utility ratemaking is found in *Colorado Municipal League v. Public Utilities Commission*, 198 Col. 217, 597 P.2d 586 (banc 1979), cited by the *Western District in State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d at 225.[2] If those opinions do not adequately reflect the tax accounting principles involved as distinguished from the application of those principles to ratemaking, they convey the general idea.

Having made these preliminary observations, primarily to define the terms "normalization" and "flow-through" and to indicate the legal subject matter of the appeal, we proceed to a consideration on the merits. On the merits, as indicated, Empire has the burden to make a convincing showing that the Commission's order is not reasonable or lawful. *State ex rel. Chicago, Rock Island & Pacific R. Company v. Public Service Commission*, 312 S.W.2d 791, 796[3] (Mo.banc 1958); *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d at 223. Empire's brief is no model of clarity. The single point articulated is that "[t]he Circuit Court of Jasper County, Missouri, did not err in reversing the Commission's Report and Order of June 17, 1983, as said order is unlawful and unreasonable and unsupported by competent and substantial evidence upon the whole record...." Then, as previously noted, the Company asserts that the Commission's finding that no report and order determining the Company's *cost of service* is erroneous in that a report and order does exist; it further contradicts, upon the basis of several administrative reports, the Commission's finding that it was impossible to de-

**2.** We have paraphrased the language of the Fifth Circuit's opinion simply because the "normalization" process was disparaged. The court seemed to accept the views of James C. Bonbright, who was a staunch critic of normalization. See *Alabama-Tennessee Natural Gas Company v. Federal Power Commission*, 359 F.2d at 327, n. 15. We are in cordial agreement with the Western District's view that the normalization of taxes in utility ratemaking is at present widely accepted. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d at 225. See also Hahn & Aliff § 17.02[7], where the arguments for normalization as an accounting procedure are summarized.

termine whether Empire was flowing-through tax timing differences as contrary to the competent and substantial evidence. The form of the Commission's finding is also attacked in subpoint C. It is further contended that it would be inimical to public policy to prohibit the correction of past errors in the ratemaking process. The Company also asserts that the rate of return is confiscatory.

It would be simple—and probably sufficient—to dismiss a number of these contentions without much consideration. For example, the first subpoint might be answered simply by saying that the cost of service is but one consideration in the determination of the reasonableness of the rate, as was held in *Shepherd v. City of Wentzville*, 645 S.W.2d 130, 133 (Mo.App.1982). It is in any event a sufficient answer to subpoint C, which complains of the *form* of the Commission's finding, to say that its findings, taken as a whole, are sufficiently definite and certain in the circumstances of the case. As noted in *Glasnapp v. State Banking Board*, 545 S.W.2d 382, 386 (Mo. App.1976), the zone of propriety between the extremes of mere conclusion and undue particularity has never been accurately defined. The finding—*on one issue*—that the Commission could not ascertain what method of accounting was being used from the Company's books of account is as much as the Commission needed to state, and the balance of its finding may be disregarded as surplusage.

It is true, of course, that reviewing courts ordinarily consider appeals on the basis of the issues presented by the appellant. *State v. Division 1287 of Amalgamated Ass'n of Street, Electric Ry., and Motor Coach Employees of America*, 361 S.W.2d 33, 44[4] (Mo.banc 1962), rev'd on other grounds 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963), reh. denied, 375 U.S. 870, 84 S.Ct. 29, 11 L.Ed.2d 100 (1963). In this case, it is neither expedient nor desirable to do so. We therefore confine our attention to the dispositive issues on appeal, which are: 1) Did Empire establish that at all times in question it used a flow-through method of accounting, and 2) as-

suming it did, is there any principle of law which required the Commission to add back the "accumulated deferred taxes" to the rate base? In our view the answer to both questions is negative: No.

▮ In connection with the first point, it must be understood that Empire filed revised tariffs seeking increased rates for its Missouri electric service on July 30, 1982. On August 20, 1982, the Commission suspended the revised rate schedules from August 1982 to June 28, 1983. Various industrial consumers were permitted to intervene and a public hearing was held at Joplin. The Commission proposed and both it and the Company initially utilized a test year period ending October 31, 1982, updated through December 31, 1982, to determine the rate base. On February 28, 1983, a prehearing conference was held and on March 21, 1983, further hearings were commenced. At this time, Mr. Hunter, the Director of Financial and Regulatory Accounting Service, filed supplemental testimony, stating that "After the filing of the minimum filing requirements, ... it was discovered the Company had overstated the deferred income taxes and investment tax credits deducted from its rate base."

The Company then produced an expert witness, Mr. Wilson, who was an accountant. His expertise is to be conceded. The change he proposed was stated thus: "Empire's Missouri rate base for the test period ... is understated by approximately $4,092,000. Of this total amount, approximately $3,479,500 is applicable to pre–1974 deferred income taxes and $612,500 is applicable to pre–1971 investment tax credits. None of the $4,092,000 should have been deducted from Missouri rate base as was inadvertently done by the Company...."

Mr. Wilson went on to explain that Empire had "consistently deferred investment tax credits and liberalized depreciation on its books and accounting records under the FPC/FERA Uniform System of Accounts. That is, Empire normalized investment tax credits and liberalized depreciation for accounting purposes and at the time of its

filing, Empire believed that Missouri rates had always been based upon such tax normalization. However, it was discovered after the Company's original filing, that this was not the case and that the Company had deducted from rate base deferred taxes for the years 1954–1973 which it should not have because those deferred taxes had never been charged through rates." It is evident from this testimony that in order to justify the massive add-back it sought, Empire undertook to, and did, convert the hearing from a "future period" (test year) determination of the deferred-tax component to a combined "historical-future period" covering the years 1954 to 1973. The Staff of the Commission protested, but the Commission allowed the Company to develop its past treatment of accelerated depreciation. For this reason, we have referred to the Company's proposed increase in rate base as an "add-back." Empire sought to increase its rate base retrospectively.

The Company did not produce any of its original records; in the circumstances it was probably impossible to do so. Both the Company and the Commission relied primarily on the testimony of experts to establish what the records would show. The proper function of an evidentiary hearing on proposed increased rates is to permit the Commission to ascertain the facts upon which to base its judgment in arriving at a fair value rate base. *State ex rel. Joplin Water Works Company v. Public Service Commission,* 495 S.W.2d 443, 445 (Mo. 1973). There are a number of cases, including at least two from our own jurisdiction, indicating that a properly qualified accountant may testify what records and books of account show. See *Bauman v. Centex Corp.,* 611 F.2d 1115, 1120[10] (5th Cir.1980); *Benz v. Powell,* 338 Mo. 1032, 1038–39, 93 S.W.2d 877, 880[5, 6] (1936); *State ex rel. Sullivan County v. Maryland Casualty Co.,* 334 Mo. 259, 265, 66 S.W.2d 537, 539[4, 5] (1933); *Parkview General Hospital, Inc. v. Ashmore,* 462 S.W.2d 360, 365–66 (Tex.Civ.App.1971). However, the Commission, as a trier of fact, was not obliged to give one expert's testimony greater weight than that of another. *Scanlon v. Kansas City,* 325 Mo. 125, 149–50, 28 S.W.2d 84, 95[15, 16] (banc 1930); *Busch & Latta Painting v. State Highway Commission,* 597 S.W.2d 189, 203[15] (Mo.App.1980); *State v. Jordan,* 532 S.W.2d 776, 781[2] (Mo.App.1975); *Hotchner v. Liebowits,* 341 S.W.2d 319, 328[11] (Mo.App.1960). Mr. Wilson was admittedly an expert and he had at some time participated in an audit of the Company's records. He testified at length concerning the Company's books of account; the thrust of his testimony was that from 1954 to 1973, the Company had always used the flow-through method of accounting in rate-making. However, in testimony given on March 25, 1983, Mr. Wilson was asked the following questions:

"Q. Well, if I or any other accountant were to currently go to the Empire District Electric Company's headquarters office and audit the books, would there be some place in those books written out where the tax timing differences would be obvious; that is, that there is—due to ratemaking, there are benefits being flowed through directly to the ratepayer; whereas, for tax purposes, there is a deferred tax reserve?

A. As far as the books and records, in response to your question, today if you were to go and look at those books—and I want to qualify that looking at them today—a person looking at them today cannot take their eyes today and look back in history and apply the same standards."

\*     \*     \*     \*     \*     \*

Several other questions were put, and the examiner finally concluded:

"Q. *So there is no real documented place on the company's books in any way that this Commission can look to as concerns the direct question of flow-through during the '50s and '60s as concerns this issue?*

A. *Not—that's correct, not for rate-making purposes, no.*" (Emphasis added.)

The Staff accountants' evidence, which amounted to a recommendation that the Commission add back $202,115 to the Company's rate base, appears to have been based on extrapolations from examination of the Company's records. Mr. Schwieterman testified he concluded the Company's add-back was based on a 1958 rate order, but the Company filed tariffs in 1963 to reduce revenues by $300,000. This reduction was permitted without a hearing, effective July 1, 1963. The staff accountants were unable to determine, for lack of correspondence or work papers, whether deferred taxes or deferred investment tax credits were included in determining rates in the 1963 order. We need not recite the whole administrative record; what we have said demonstrates that there was a substantial evidentiary basis for the Commission's conclusion that "the real question of whether Empire was flowing through tax timing differences for ratemaking purposes is impossible to determine...."

■ Again, as we noted, Empire also advances an argument based on the continued force of the 1958 ratemaking order. Section 386.490.3, RSMo, states in terms "Every order or decision of the Commission ... shall continue in force either for a period which may be designated therein or until changed or abrogated by the commission...." The substance of this argument is that because there was no express, written order terminating the 1958 order, it therefore must have remained in force. Empire points out that between 1963 and 1968, it was allowed several other rate changes without a formal report and order rescinding it. Perhaps this is a logical assumption. The Commission was not bound to accept it as proof that Empire had at all times used flow-through accounting for the purposes of Missouri ratemaking, when the Company's books did not show as much. We may not substitute our judgment for that of the Commission.

■ This brings us to the second inquiry: Is there any principle of law which required the Commission to add back the sum of $4,091,895? As indicated, we believe the answer is "No," subject to a possible exception not shown by the record.

There is a line of cases, decided before and after enactment of the Tax Reform Act of 1969 (which modified the Revenue Act of 1954), which hold directly or by clear implication that a regulatory agency may fix rates without regard to the utility's accounting system. *Alabama-Tennessee Natural Gas Company v. Federal Power Commission*, 359 F.2d at 336; *In re Hawaii Electric Light Company, Inc.*, 690 P.2d 274, 278[7] (Haw.1984); *Kansas Power & Light Company v. State Corporation Commission*, 5 Kan.App.2d 514, 620 P.2d 329, 339[11] (1981); *New England Telephone and Telegraph Company v. Public Utilities Commission*, 390 A.2d 8, 23[5] (Me.1978); *State ex rel. Allain v. Mississippi Public Service Commission*, 435 So.2d 608, 616 (Miss.1983); *Pennsylvania Power & Light Company*, 10 Pa.Commw 328, 811 A.2d 151, 157 (1973). Our Supreme Court indicated as much in *State ex rel. Hotel Continental v. Burton*, 334 S.W.2d 75, 80[4] (Mo.1960). Empire, in the "statement of facts" part of its brief, asserts that the Tax Reform Act of 1969 *required* regulatory agencies to normalize, for *ratemaking* purposes, "tax-timing" differences associated with liberalized depreciation if the utility was to continue to do so. To the contrary, the regulated utility industry and this court understand that in *Federal Power Commission v. Memphis Light, Gas and Water Division*, 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973), the United States Supreme Court held that § 167(1) of the Internal Revenue Code did not limit the discretion of the Federal Power Commission (now the Federal Energy Regulatory Commission) to approve either normalization or flow-through accounting. See "Progress of Regulation," 105 Pub. Util.Fort. 49, May 8, 1980. By implication, this ruling extends to state regulatory agencies. The Supreme Court did not address regulatory treatment of accelerated depreciation except to order the cause remanded to the FPC.

It may be that if, after enactment of the Tax Reform Act of 1969, a regulated utility elected to use the normalization method of accounting, its eligibility to utilize accelerated depreciation with respect to *certain classes of property* may be jeopardized if the rate base is not calculated in accordance with Treas.Reg. 1.167(1)–1(h)(6), T.D. 7315, 39 F.R. 20195a (1974). There is authority which suggests as much, *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission*, 53 Pa.Commw 186, 417 A.2d 819 (1980); Comment, supra, 105 Pub.Util.Fort. 49. And, we suppose that any ratemaking order which would jeopardize a public utility's eligibility to utilize accelerated depreciation as permitted by 26 U.S.C.A. § 167(1) would be "unreasonable." However, depreciation allowances for regulated utilities have been changed several times since the enactment of the Tax Reform Act of 1969. Moreover, the record before us does not positively demonstrate that Empire ever elected to utilize the normalization accounting method as to all its property. Mr. Wilson cited the Treasury Regulation to the Commission and indicated at one point that Empire had "consistently" normalized investment tax and liberalized depreciation for accounting purposes. But in other testimony, Mr. Wilson stated:

"A. ... I am not familiar precisely with the various state commissions and the FERC as to what they're requiring the company to do in regard to the accelerated cost recovery system that came into effect just recently. But I believe there are some timing differences that are [now] being flowed through.

Q. Well, let's relate the questions specifically to Missouri.

A. I believe that to be the case, yes, there are some [tax] timing differences that are being flowed through."

\* \* \* \* \* \*

Tax-timing differences which are being flowed-through cannot be said to have been normalized. Mr. Wilson's testimony is not necessarily contradictory, but it does not establish complete normalization, either.

Moreover, Treas.Reg. 1.167(1)–1(h)(6) (1974), did not in any case contemplate a wholesale add-back to the taxpayer's rate base *at the same rate of return* as all other items included therein. Most regulatory agencies have either deducted deferred taxes from rate base or included them in the utility's capitalization at no cost. Phillips, op.cit. at p. 273. The regulation as updated does not prohibit deduction or treatment of deferred taxes as zero-cost capital; it merely puts a cap on the amount which may be deducted. Hahn & Aliff, op. cit. § 17.04, p. 17–36. The application of the interpretative Treasury Regulation cited was simply mentioned before the Commission, and as far as we can ascertain, the rate base calculation does not violate the IRS's command. If it does, that infirmity has not been briefed and we cannot become advocates for Empire and inquire of our own motion. We may add that we do not believe deferred taxes and ITC credits belong in the same category for accounting or ratemaking purposes, *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Service Commission*, 606 S.W.2d at 226, but Empire has considered them as being very similar and again we have no obligation to develop the subject sua sponte.

Upon the record presented, we conclude the Commission had the right to fix the rate base without regard to Empire's accounting practices. In the event IRS disagrees through one of its letter rulings, Empire has a remedy available.

■ Another argument stated but not really developed by Empire is that the rate of return is confiscatory. Review of such a contention would require consideration of all the elements of the rate base and the assignment of error is not particularized. The burden is on Empire to show that the rate of return allowed is not just and reasonable. It has failed to discharge that burden.

On the record presented, we affirm the judgment of the Commission; the cause is reversed and remanded with instructions to the Circuit Court to enter an order affirm-

ing the Commission's order and to assist the Commission in enforcing any contingent refund order it may have entered.

PREWITT, C.J., concurs.

CROW, J., concurs in separate concurring opinion.

MAUS, J., dissents.

CROW, Judge.

I concur in the result reached by the principal opinion, but arrive there by a different route.

This seemingly bewildering litigation becomes easier to understand if, at the outset, one can comprehend that the *dispute,* in *this appeal,* pertains *only* to the period from July 1, 1963, to December 31, 1973, and *only* to Empire's accumulated deferred taxes related to *accelerated depreciation* during *that* period. The judgment of the Circuit Court of Jasper County ("the trial court") left the Commission's Report and Order of June 17, 1983 (Commission case number ER–83–42) intact except as to *those accumulated deferred taxes during that period.*

Accumulated deferred taxes related to *investment tax credit* ("ITC") during the period from 1963 through 1970 are also referred to in the principal opinion, but one must understand that accumulated deferred taxes related to *ITC* are *not* the same as accumulated deferred taxes related to *accelerated depreciation.* The trial court did *not* disturb the Commission's Report and Order in regard to any accumulated deferred taxes related to *ITC.*

The single question on this appeal is whether the Commission's decision to treat Empire's accumulated deferred taxes related to *accelerated depreciation* during the period from July 1, 1963, to December 31, 1973, as a *deduction* from rate base in calculating Empire's revenue requirement in Commission case ER–83–42 was lawful and reasonable. The trial court said no,

and reversed the Commission's decision on that point. The Commission, on this appeal, challenges only that segment of the trial court's judgment.[1]

The Commission, in its brief, concedes that if the tax-timing differences associated with Empire's deferred reserves related to accelerated depreciation during the years in question were treated on a *flow-through* basis for *ratemaking* purposes, then deduction of the deferred reserves from Empire's rate base is *not* warranted. Empire contends that the evidence before the Commission established that during the period in question, Empire *was* treating the tax-timing differences related to the deferred reserves arising from accelerated depreciation on a flow-through basis for ratemaking purposes. The Commission, of course, argues otherwise. Therein lies the dispute.

A chronology of certain significant events is helpful in understanding each side's position.

The parties agree that prior to 1954, taxpayers were required to use straight-line depreciation in calculating depreciation expense as a tax deduction. Consequently, in a 1952 rate increase case (Commission number 12,292), Empire's tax expense for *ratemaking* purposes was necessarily based on the actual amount of tax expense incurred. This, as explained in the principal opinion, was *flow-through* treatment.

In 1954, when the amendment to the Internal Revenue Code gave taxpayers the option of using accelerated depreciation for calculating depreciation expense as a tax deduction, Empire began calculating depreciation that way.

On June 20, 1956, the Commission issued an accounting order authorizing Empire to normalize, for accounting purposes only, the tax-timing differences created by accelerated depreciation. The Commission's order specifically provided that the authority therein was *not* to be controlling for *ratemaking* purposes. As a result of this order, Empire began normalizing on its books

---

**1.** As explained in the principal opinion, *Empire* initiated this proceeding in the trial court. The trial court affirmed the Commission's order in all respects save the one which forms the basis for this appeal by the *Commission.* Empire did not appeal.

the tax-timing differences created by accelerated depreciation, and thus created on its books an appropriate deferred tax reserve.

In a 1958 rate increase case (Commission number 13,723), the Commission required flow-through treatment by Empire for the tax-timing differences associated with accelerated depreciation in the calculation of Empire's revenue requirement. This, again, constituted *flow-through* treatment for *ratemaking* purposes. As part of the Commission's decision in that case, it stated it had instructed its staff to delete deferred tax expenses associated with liberalized depreciation from operating income statements of all utilities for ratemaking purposes.

After Empire's 1958 rate increase case, the only changes in Empire's Missouri retail electric rates for the next 15 years consisted of seven separate rate *reductions*, the first of which took effect on or about July 1, 1963. The subsequent reductions occurred intermittently through 1969. Each reduction was implemented by Empire's filing of revised tariffs, and by the Commission's allowing the tariffs to become effective without formal investigation. The Commission issued no Report and Order regarding any of the seven rate reductions.

From 1954 through 1973, the Commission issued four decisions applicable to utilities other than Empire in which *flow-through* treatment for *ratemaking* purposes was required regarding accumulated deferred taxes from accelerated depreciation. These four decisions involved three utilities, two of which were electric companies. The record discloses *no* Commission decisions from 1954 through 1973 directing the use of *tax normalization* ratemaking treatment for accumulated deferred taxes from accelerated depreciation.

In December, 1973, in a rate increase case (Commission number 17,816), Empire was authorized to establish rates on the basis of the *tax normalization* method of treating tax-timing differences associated with accelerated depreciation. This was the first rate case in which the Commission

issued a Report and Order authorizing Empire to *normalize*, for *ratemaking* purposes, the tax-timing differences related to accelerated depreciation.

In 1982, when Empire sought the rate increase that spawned this litigation, Empire, in its prepared testimony and exhibits filed with the Commission, treated all accumulated deferred taxes related to accelerated depreciation as a *deduction* from Empire's rate base, as if the tax-timing differences which produced the deferred reserves had been treated on a *tax normalization* basis for *ratemaking* purposes by the Commission. However, in supplemental testimony filed prior to the evidentiary hearings before the Commission, Empire, for the first time, asserted that the tax-timing differences related to the deferred reserves associated with accelerated depreciation for the period from 1954 through 1973 were treated on a *flow-through* basis for *ratemaking* purposes by the Commission. Consequently, Empire revised its calculation of its jurisdictional rate base by eliminating the deduction of those deferred reserves for the period from 1954 through 1973. Empire also eliminated the deduction of the deferred reserves associated with ITC during the period from 1963 through 1970, but the Commission restored that deduction, and the trial court did not disturb the Commission's ruling on that item.

The Commission, in its findings in this case, noted that the issue whether Empire's tax-timing differences which produced the accumulated deferred taxes related to accelerated depreciation had been treated on a *flow-through* basis or a *tax normalization* basis for *ratemaking* purposes required interpretation and evaluation of events which occurred as long as 30 years ago. The Commission observed that where no report and order determining a company's elements of cost of service exists, the Commission cannot reach back in time and determine the intent of previous Commission actions that allowed rate decreases to go into effect without investigation or suspension. Thus, said the Commission, the

real question whether Empire was flowing through tax-timing differences for rate-making purposes is impossible to determine. Furthermore, said the Commission, Empire's witness admitted that the question could not be answered by looking at Empire's books. The Commission reasoned that if the question cannot be answered from Empire's books, and there are no reports and orders to look to, the Commission was constrained to agree with its staff that this is a very "cold trail." The Commission consequently adopted its staff's position that flow-through treatment had not been established.

At this point, it is helpful to note that the *beginning date* of the period in dispute on this appeal is July 1, 1963. That date, it will be recalled, was the date when the *first* of Empire's seven rate *reductions* went into effect. The last Report and Order issued by the Commission regarding Empire's rates prior to that date was the one in 1958 in Commission case 13,723, which, as already explained, had required *flow-through* treatment of the tax-timing differences associated with accelerated depreciation for ratemaking purposes.

It is also helpful to remember that December 31, 1973, the *ending date* of the period in dispute on this appeal, was evidently the final day before the Commission's Report and Order in its case 17,816 took effect. That order, as previously noted, granted Empire a rate increase and authorized Empire to establish rates on the basis of the *tax normalization* method of treating tax-timing differences associated with accelerated depreciation.

In short, there is a Report and Order by the Commission (case 13,723) establishing that the *flow-through* method was utilized by the Commission in authorizing Empire's rates prior to the reduction that went into effect July 1, 1963, and another Report and Order by the Commission (case 17,816) establishing that the *tax normalization* method was utilized by the Commission in authorizing Empire's rates after December 31, 1973. There is, however, *no* Report and Order by the Commission establishing

which method was utilized between July 1, 1963, and December 31, 1973, the period in question.

The trial court found that the Commission's decision in the instant case (ER–83–42) excluding from Empire's rate base the accumulated deferred taxes associated with accelerated depreciation from July 1, 1963, through December 31, 1973, was unreasonable and unlawful, and contrary to the competent and substantial evidence upon the whole record. The reasons given by the trial court were: (1) the Commission specifically disallowed, in Empire's 1958 rate case, number 13,723, any deferred tax expense related to accelerated depreciation; (2) in addition to specifically disallowing these deferred taxes from Empire's cost of service in the 1958 case, the Commission acknowledged that it had previously directed its staff to delete such deferred tax expenses in all rate proceedings; (3) the Commission issued no other rate orders involving Empire's cost of service until 1973; (4) there was no evidence that the Commission's directive to its staff was ever rescinded or altered during the period in dispute; and (5) there was no evidence that the Commission ever permitted recovery of deferred taxes associated with accelerated depreciation in the rates authorized to be charged by Empire or by any other utilities under the Commission's jurisdiction prior to 1973. Therefore, said the trial court, it would be unreasonable for the Commission to assume that Empire would propose rate reductions beginning in 1963 based upon a cost of service which included deferred tax expense related to accelerated depreciation. It would be even more unreasonable, added the court, for the Commission to assume that its staff would accept, or that the Commission would approve, for implementation, rate changes premised on a cost of service which included deferred tax expense associated with accelerated depreciation.

Reduced to essentials, the trial court's rationale was that the last Report and Order by the Commission regarding Empire's rates prior to the period in dispute required

that the tax-timing differences associated with accelerated depreciation be accorded *flow-through* treatment for ratemaking purposes, that there was evidence that this remained the policy of the Commission during the period in dispute, and that there was *no* evidence of any Commission decision during the period in question directing the use of *tax normalization* ratemaking treatment for accumulated deferred taxes from accelerated depreciation. That being so, the trial court reasoned that the Commission could not assume that Empire, in any of the seven rate *reductions* during the period in dispute, would have proposed rates based upon a cost of service which included deferred tax expense related to accelerated depreciation. The trial court felt it would be even more unreasonable for the Commission to assume that its staff would have accepted, or that the Commission would have approved for implementation, rate reductions during that period premised on a cost of service which included deferred tax expense associated with accelerated depreciation. In essence, the trial court determined that it would be unreasonable to assume that Empire, in presenting its rate reductions, or the Commission, in approving them, departed from the established policy of flowing-through, for ratemaking purposes, the tax-timing differences associated with accelerated depreciation.

In arguing that the trial court erred, the Commission concedes that in its 1958 Report and Order in case 13,723, it directed flow-through ratemaking treatment for Empire's tax-timing differences related to accelerated depreciation. The Commission also acknowledges that under § 386.490.3, RSMo 1978, all orders of the Commission shall continue in force until changed or abrogated by the Commission or until found unlawful or unconstitutional. However, says the Commission, this statutory provision cannot reasonably be interpreted to have barred Empire from proposing, within a rate filing subsequent to the 1958 Report and Order, the use of tax normalization ratemaking treatment for accelerated depreciation tax-timing differences.

The Commission argues that to so construe the statute would effectively eliminate the possibility of the Commission modifying its previously established positions upon the initiative of utilities in Commission proceedings. The Commission theorizes that Empire *could have* incorporated tax normalization ratemaking treatment into its seven rate reduction tariff filings during the period in issue; consequently, the focus of the Commission in its determination in the instant case necessarily centered on the evidence presented by Empire in support of its assertion that flow-through treatment was used in all seven rate reductions. The Commission reminds us that the burden was on Empire to prove its contention.

Empire concedes it has the burden of demonstrating that the Commission's order is unlawful and unreasonable and unsupported by competent and substantial evidence upon the whole record. Empire maintains, however, that its burden is satisfied by (a) the Commission's 1958 Report and Order in its case 13,723 which conclusively establishes that at that time the tax-timing differences associated with deferred reserves related to accelerated depreciation were given flow-through treatment for ratemaking purposes, (b) the fact that the Commission's policy, during the period in dispute, that such deferred tax expenses were to be disallowed as a cost of service element in setting rates in other rate cases was never altered or rescinded, and (c) § 386.490.3, RSMo 1978, which provides that all orders of the Commission shall continue in force until changed or abrogated by the Commission or until found unlawful or unconstitutional. These factors, says Empire, compelled a finding by the Commission that Empire's rates in the seven rate reductions beginning July 1, 1963, and extending through December 31, 1973, were established by according flow-through treatment for the deferred reserves related to tax-timing differences associated with accelerated depreciation. Empire insists that the trial court was correct in reasoning that Empire would not have proposed a rate reduction during that

period "in which they would have tried to slip in tax normalization," and in reasoning that neither the Commission's staff nor the Commission itself would have approved any rates so calculated.

The Commission, on the other hand, emphasizes that where the burden of proof is upon the utility, and the Commission, by its decision, determines that the utility has failed to meet its burden of proof, the issue before the reviewing court is whether the Commission's decision is clearly contrary to the overwhelming weight of the competent and substantial evidence upon the whole record. The Commission reminds us that we are not to substitute our judgment for that of the Commission. *State ex rel. Dyer v. Public Service Commission*, 341 S.W.2d 795, 802[8] (Mo.1960); *cert. denied*, 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 384 (1961).

The Commission points out that there was a "complete absence from the record of any documentation by [Empire] as to the cost of service elements in general, and the accelerated depreciation tax-timing difference ratemaking method, in particular, which were included in any of Empire's seven rate reductions of the 1960's." The need for such documentation, says the Commission, "is particularly acute in a situation such as presented in this case where Empire is seeking a judgment from the present-day Commission as to the composition of a non-suspended rate change which occurred more than twenty years ago." The Commission insists that the fact that a limited number of Missouri utilities other than Empire were directed to use flow-through ratemaking treatment for accelerated depreciation tax-timing differences within an approximate 20-year period falls short of establishing that the Commission maintained a universal, unyielding policy on this issue for all utilities under its jurisdiction.

Given the posture of the record and the contentions of the respective parties, our task, as I see it, is to decide whether, despite the Commission's policy requiring flow-through ratemaking treatment for ac-

celerated depreciation tax-timing differences during the period in question, the Commission could nonetheless properly hold—by reason of the absence of documentary evidence by Empire that it had followed that policy in the seven rate reductions during the period in question—that Empire had failed to prove that its rates during such period had been based on flow-through ratemaking treatment for accelerated depreciation tax-timing differences. More simply put, was the Commission compelled to presume that Empire, the Commission's staff, and the Commission, in the seven rate reductions during the period in dispute, utilized the flow-through method instead of the tax normalization method, or was the Commission justified in requiring Empire to produce documentary evidence that flow-through had *in fact* been used, and in ruling that Empire had failed to sustain its burden of proof when no such documentation was forthcoming?

It is not for us to decide the fact question of whether flow-through or tax normalization was used. Our inquiry is only whether the Commission's finding that Empire failed to prove that flow-through was used is contrary to the weight of the competent and substantial evidence upon the whole record.

Recognizing that our decision is confined to that issue, and recalling that Empire, when it initially filed its prepared testimony and exhibits with the Commission in this case, treated all accumulated deferred taxes related to accelerated depreciation as a deduction from its rate base, as if the tax-timing differences which had produced the deferred reserves had been treated on a *tax normalization* basis for ratemaking purposes, I am convinced that we cannot disturb the Commission's finding. In my view, a fact-finder, on this record, could have reasonably reached either of the results argued for by the respective parties. That being so, the Commission's finding must be upheld.

For the foregoing reasons, I concur in the result reached by the principal opinion.

MAUS, Judge, dissenting.

I agree with the analysis and statement of the issue in this case as developed by Judge Crow. That issue was succinctly recognized in the following question asked of and answer given by the staff accountant of the Public Service Commission who sponsored the schedule that deducted the deferred taxes in question from Empire's rate base:

> Q. Then I would also assume that you would agree with the statement that if rates in '63 to '73 were based on flow-through, then accumulated deferred taxes appearing on company's books for these years are not properly deducted from rate base?
>
> A. That's right.

However, because of my view of the evidence, I cannot agree with the result reached by the principal opinion or the concurring opinion. I respectfully dissent.

The limited scope of judicial review of the Report and Order of the Commission has been stated. However, the evidence relevant to the issue presented is undisputed. The Commission did not find any of that evidence unworthy of belief. See *Wilson v. Labor & Indus. Rel. Com'n,* 573 S.W.2d 118 (Mo.App.1978). The undisputed evidence may not be arbitrarily disregarded by the Commission. *Mo. Church of Scientology v. State Tax Comm.,* 560 S.W.2d 837 (Mo. banc 1977), cert. denied, 439 U.S. 803, 99 S.Ct. 57, 58 L.Ed.2d 95 (1978). The question is whether or not from the undisputed evidence the Commission could reasonably find that the rates in force during 1963–1973 were not based upon the flow-through of accelerated depreciation.

The Commission deducted the deferred income taxes in question from the rate base upon the premise of two findings. The first finding is the absence of records or documents that expressly and specifically show the rates for 1963–1973 were based upon flow-through. In that respect the Commission said, "If this question cannot be answered from the Company's books and there are no reports and orders to look to, the Commission must agree with the Staff that this is a very 'cold trail' and the Commission *therefore adopts the Staff's position.*" (emphasis added).

It may be assumed "the Company's books" referred to are the corporate accounting records of Empire showing income and expense and a balance sheet. There is nothing in the record before the Commission or this court to establish that those books could be expected to reflect the calculations upon which the 1963 and subsequent rate schedules were based. The testimony of independent C.P.A. Wilson tends to establish that those books could not be expected to reflect those calculations. Both Empire and the Commission acknowledged the absence of work papers to explain or support those schedules. The record does not establish that either Empire or the Commission could be expected to preserve the work papers for the 1963–1973 rate schedules. In these circumstances, the absence of documentation of the formulation of those rate schedules should not be considered to establish that accelerated depreciation was not in those years accorded flow-through treatment for rate making purposes.

The Report and Order in question also states that Empire believed that its Missouri rates had always been based upon normalization and "[t]he Commission in this instance is greatly persuaded by the company's prior practice."

The application in this case was filed July 30, 1982. Because those preparing that application believed Empire had always normalized for rate making, the rate base initially proposed did not include deferred tax reserves for the period in question. In November, 1982, in connection with a proceeding in another state, an independent C.P.A. reviewed Empire's treatment of deferred income taxes and rates prior to 1974. As he testified, from his examination of the relevant evidence, it was his opinion that for the period in question accelerated depreciation had been accorded flow-through treatment for rate making. The proposed rate base was amended to add the deferred tax reserves for that period.

The initial mistaken belief of Empire's representatives that it had always normalized for rate making was apparently based upon two facts. First, after 1956, by virtue of Report and Order No. 13,376, Empire was permitted, for corporate bookkeeping purposes only, to normalize these tax consequences of accelerated depreciation. This would include establishing and keeping a record of deferred tax reserves. Further, also by virtue of Report and Order No. 17,816, from 1973 to the date of the present application Empire did normalize for rate making purposes. However, also by Report and Order No. 13,723, it affirmatively appears that Empire's prior practice during the years 1958 to 1963 was flow-through for rate making. That was acknowledged by staff in this case. This practice should be equally persuasive. Under these circumstances, I do not construe the initial error in the preparation of the application to demonstrate that during 1963–1973 accelerated depreciation was not accorded flow-through treatment for rate making purposes.

I agree with the trial court that the only reasonable inference from the evidence is that for rate making purposes for 1963–1973 accelerated depreciation was accorded flow-through treatment. Each facet of the salient evidence provides such an inference.

The first such facet is the history of the Commission's recognition of accelerated depreciation. In 1956, the Commission authorized "normalization for bookkeeping purposes only." This results in a clear inference flow-through was required for rate making. That requirement is clearly established by the Report and Order approving Empire's rate schedule in 1958. By that Report and Order, the Commission added such deferred income taxes to Empire's adjusted net operating income. Thereby, Empire's rates approved in 1958 were based upon flow-through.

Second is the fact that by 1958 the Commission had established a firm policy of requiring flow-through treatment for rate making purposes by utilities. This is demonstrated by the following language:

The Staff of the Commission has recently been instructed by the Commission to delete such expenses from operating income statements *in rate proceedings*, therefore, the adjusted net operating income for Missouri last shown above should be increased by $83,882.37.

Re: The Empire District Electric Company, 22 PUR 3d 399, 406, 7 Mo.P.S.C. (N.S.) 491, 500, Case No. 13,723 (1958) (emphasis added). It is particularly significant that the instructions to the staff of the Commission were not limited to Empire's application under consideration in that case but to "rate proceedings." The consistent application of this instruction by the staff is demonstrated by Reports and Orders approving rates of other public utilities in three cases. Re: Kansas City Power & Light Company, 8 Mo.P.S.C. (N.S.) 214, Case No. 13,822 (1958); Re: Missouri Power & Light Company, 7 Mo.P.S.C. (N.S.) 449, Case No. 13,721 (1957); Re: Joplin Water Works Company, 7 Mo.P.S.C. (N.S.) 375, Case No. 13,592 (1957). The Commission's accountant, heretofore referred to, testified that he had no knowledge of a Report and Order during the period in question which approved normalization for rate making purposes.

The third facet is the Commission's own recognition of its policy and practice. This policy and practice is demonstrated in Kansas City Power & Light Company, Case No. 16,803, 15 Mo.P.S.C. (N.S.) 71 (1970). The application in that case sought a rate increase. It was filed on July 28, 1969. It was the first general filing by the utility for an increase in rates since June 1, 1954. In the interim, the utility twice reduced rates, once in 1963 and again in 1965. In case No. 16,803, AEC, an intervenor, contended there should be deducted from the utility's rate base $17,669,442 "representing certain alleged deferrals for income taxes (accelerated amortization, liberalized depreciation, investment tax credit)." In denying that contention, the Commission declared:

The Company's treatment of the reserve for accelerated amortization is in

accordance with orders entered by this Commission in Cases Nos. 12,498 (Union Electric Company) and 12,735 (Kansas City Power & Light Company), in both of which this Commission held that the balance in the reserve for deferred income taxes as a result of accelerated amortization should not constitute an item of deduction from plant in determining the net rate base in any rate proceeding. AEC acknowledges that its proposed deduction from the rate base of $8,737,650 as accumulated deferred taxes due to liberalized depreciation should not be made if the Company has been regulated for rate-making purposes on a flow-through basis. Neither the Staff nor the Company proposed any such deduction. *The Commission has consistently regulated the Company on a flow-through basis* as is stated in its order in Case No. 16,592 (Kansas City Power & Light Company). The weight of the credible evidence is against deduction of the aforesaid from the rate base.

Re: Kansas City Power & Light Co., Case No. 16,803, 15 Mo.P.S.C. (N.S.) 71, 76 (1970) (emphasis added). Apparently the 1963 and 1965 rate reductions by Kansas City Power & Light were accomplished in the same manner as the interim rate reductions by Empire. The Report and Order in Case No. 16,803 does not state the work papers supporting the 1963 and 1965 rate reductions were before the Commission. In the absence of such a statement, it seems unlikely they were. If they were not, the Report and Order in Case No. 16,803 accords favorable consideration to Kansas City Power & Light which was denied to Empire in this case. In all events, the Report and Order in Case No. 16,803 is clear evidence of the consistent application of the policy of the Commission requiring flow-through treatment of accelerated depreciation for rate making.

The fourth facet is the structure of the interim rate reductions by Empire. Those rate reductions were a revision of rates to result in a reduction in income of a stated amount. For example, the 1963 Revised Rate Schedules were designed to result in a reduction of income in the amount of $300,000. This was done by the reduction of some, but not all rates. It seems very unlikely some rates based on flow-through would remain the same if the interim rate schedules were based upon normalization.

Fifth is the fact the interim rate schedules proposed by Empire were not the subject of a regulatory hearing. They were permitted to go into effect without suspension and without a report and order. In view of the firmly announced and consistently enforced policy of the Commission, the only reasonable conclusion is that those interim schedules conformed to the policy of flow-through treatment of accelerated depreciation.

The sixth such facet is a letter from the Commission to Empire. In 1969 the federal Tax Reform Act became law. If that Act did not in fact do so, at least Empire believed one of the provisions of that Act required regulatory agencies, such as the Commission, for rate making purposes, to normalize tax timing differences associated with liberalized depreciation if the utility was to continue to do so for tax purposes. As a result of that belief, by letter Empire requested that the Commission acknowledge that it would in the future permit Empire to base its rates upon normalization. On December 17, 1970, the Commission responded by its letter which in part stated: "Pursuant to the provision of the Tax Reform Act of 1969, *you are authorized to normalize* the differentials resulting therefrom for accounting purposes, *for ratemaking purposes, or* for any other purpose before this Commission *with respect to plant placed in service on or after January 1, 1970.*" (emphasis added). The fact Empire requested this acknowledgment is persuasive evidence that from 1963 to 1970, its rates had been based upon flow-through. The fact the Commission authorized normalization with respect to plant placed in service on or after January 1, 1970, rather than merely approving the continuation of a practice is virtually conclusive evidence that Empire's rates had been based upon flow-through.

The force of these facets of evidence considered together causes the conclusion of the Commission to be contrary to the only reasonable inference from the evidence. I would affirm the judgment of the trial court reversing the Report and Order in question in part and remanding the matter to the Commission for further action not inconsistent with the judgment of the trial court and this opinion.